Laura Lea KOLB, Appellant

v.

The STATE of Texas, Appellee

NO. 14-15-00658-CR

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion Filed April 6, 2017

Rehearing and Rehearing En Banc
Overruled May 17, 2017

Discretionary Review Refused
September 13, 2017

Mark W. Stevens, Galveston, TX, for Appellant.

Allison Lindblade, Galveston, TX, for State.

Panel consists of Chief Justice Frost and Justices Boyce and Christopher.

## OPINION

William J. Boyce, Justice

Appellant Laura Lea Kolb pushed her boyfriend's four-year-old daughter off a bed while appellant was intoxicated and upset with the girl's father. The fall injured the girl's spinal cord, paralyzing her lungs and ultimately causing her death by asphyxiation. A jury convicted appellant of recklessly causing serious bodily injury to a child.

At issue in this appeal is whether (1) the evidence is legally sufficient to support the jury's finding that appellant recklessly injured a child; (2) the trial court erred by admitting the medical examiner's expert testimony into evidence; and (3) the trial court erred by refusing to dismiss the case based on alleged withholding of evidence by the State. We hold that (1) the evidence is sufficient to show that appellant acted recklessly in pushing the child off the bed, even if the specific resulting injury was not foreseeable; (2) the medical examiner's testimony was admissible; and (3) the State did not withhold evidence or produce evidence in an untimely manner. Therefore, the trial court did not err. We affirm the trial court's judgment.

## BACKGROUND

Appellant and her boyfriend, Kevin Moore, returned to their apartment from a bar just before midnight on March 22, 2013. Moore's four-year-old and 15-year-old daughters were asleep in the apartment.

Upon arriving home, Moore and appellant joined other residents from neighboring apartments who were playing dominos and drinking in the apartment courtyard. Appellant admitted to having at least six drinks over the course of the evening. At some point appellant went upstairs to the apartment, called for Moore to join her, and became upset when he did not join her and would not give her a cigarette. Appellant went into the bedroom where Moore's four-year-old daughter Taylor was sleeping and pushed the child head-first off the queen-sized bed onto the floor, which was strewn with toys. Appellant then picked Taylor up, "threw" her back on the bed, and left the room.

Appellant returned to the room 10 to 15 minutes later and realized that Taylor was not breathing. She went outside and told Moore. Moore went inside, was unable to elicit a response from Taylor, and called 911.

Moore carried Taylor downstairs, where he was met by police officers arriving from the police station next door. The officers performed CPR on Taylor until paramedics arrived. Taylor could not be revived and was pronounced dead at the hospital.

Appellant was charged with murder, but a jury convicted her of the lesser-included offense of reckless injury to a child. *See* Tex. Penal Code Ann. § 22.04(a) (Vernon Supp. 2016). The trial court sentenced appellant to 14 years' imprisonment. Appellant timely appealed.

## ANALYSIS

### I. Legal Sufficiency of the Evidence

In her first issue, appellant contends the evidence is legally insufficient to support

the jury's finding of reckless injury of a child. In her second issue, appellant contends the evidence is legally insufficient to support any other lesser-included offense, such as criminally negligent injury to a child.

### A. Standard of Review

The legal sufficiency standard of review is the only standard we apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). We consider the combined and cumulative force of all admitted evidence and any reasonable inferences therefrom in the light most favorable to the verdict to determine whether a jury was rationally justified in its verdict. *Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App. 2017).

The jury is the sole judge of credibility and weight to be attached to the testimony of witnesses. *Temple*, 390 S.W.3d at 360. We defer to the jury's responsibility to fairly resolve or reconcile conflicts in the evidence, and we draw all reasonable inferences from the evidence in favor of the verdict. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). In conducting a sufficiency review, we do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Young v. State*, 358 S.W.3d 790, 801 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd).

### B. Discussion

Appellant was convicted of recklessly causing injury to a child. "A person commits an offense if [s]he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child ... (1) serious bodily injury; (2) serious

mental deficiency, impairment, or injury; or (3) bodily injury." Tex. Penal Code Ann. § 22.04(a).

"A person acts recklessly, or is reckless, with respect to circumstances surrounding [her] conduct or the result of [her] conduct when [s]he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c) (Vernon 2011). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint." *Id.* When the conduct is engaged in recklessly, the offense is a second-degree felony. *Id.* § 22.04(e).

At some point after returning to her apartment from the bar, appellant fell down outside several times and cut her leg. A neighbor helped appellant up to the apartment to bandage the injury and then encouraged appellant to lay down and rest in the bed where Taylor was sleeping. The jury heard testimony from the neighbor that, when she entered the room, Taylor was in the middle of the bed and sleeping like a normal person would sleep in a bed. The jury likewise heard testimony from Moore, who went up to the apartment to check on appellant after her injury, that Taylor was "sleeping straight up" and the "bed was perfectly made" when he looked in the room. After the neighbor and Moore went back downstairs, there was no evidence that anyone other than appellant entered the room before Taylor was discovered in a different position.

When appellant notified Moore that Taylor was not breathing, Moore went into the bedroom where Taylor had been sleeping. Moore later testified that he observed that the bed covers were messy and he could not see Taylor when he first went into the room. He threw the covers off to the side

and saw Taylor laying facedown at an angle towards the foot of the bed. Moore noticed that there was some blood around Taylor's mouth, she had wet herself, and her eyes were rolled back. Moore tried to shake her to wake her up but got no response. After calling 911, Moore carried Taylor downstairs where he was met by officers who instructed him to lay her down on the grass so they could perform CPR. Despite resuscitation efforts by the officers and later by the medical responders, Taylor was pronounced dead at the hospital.

The medical examiner testified that Taylor's cause of death was blunt force head trauma. The medical examiner explained that Taylor "had a hemorrhage in a small ligament of the spinal column," which "was a marker for the force applied to that part of the body that led to her death." The medical examiner testified that Taylor suffered blunt trauma to her head, either as a result of something hitting her in the head or her head hitting something else, and postulated that the trauma caused her head to rock forward "in a hyperflexion incident." Likening the injury to those seen in car accidents, the medical examiner testified that Taylor's head flexed forward "very quickly, very violently," causing the odontoid process—a portion of one of the vertebrae—to hit her spinal cord. This event disrupted electrical transmission through the spinal cord and "stopped her breathing immediately." Taylor then died from asphyxiation.

The medical examiner explained that a hyperflexion injury like the one he observed in Taylor results from moving the chin toward the chest very rapidly. He explained that "[t]he child has to be either impacted with something" that would push "the head forward ... extremely fast, extremely forcefully," or "the body is brought up to meet ... the chin." He

clarified that to cause hyperflexion to the degree he observed, "you either hit the kid in the head; or you throw the kid against a wall and the hit [sic] on the head—and it flexes the head downwards, the chin down to the chest; or you throw the kid onto the floor and they land on the back of their head and their body kind of continues over them causing the chest to come down and meet the chin." When asked whether a child falling and landing on the back of her head with her body weight coming down over the head could cause the type of hyperflexion observed in Taylor, the medical examiner answered, "Absolutely." The medical examiner testified that such an injury could be caused as a result of the child being thrown from an average height bed, but that such an injury would not happen from a child merely falling backwards off a bed.

The medical examiner discounted any possibility that Taylor could have suffered the hyperflexion injury as a result of resuscitative efforts by the police or medical personnel. He also discounted any possibility that the injury could have been sustained when Moore carried Taylor down to the apartment courtyard to meet the police, noting that carrying a child in such a manner would, if anything, bend the neck in the exact opposite direction from that needed to cause Taylor's injury.

The jury also viewed video recordings of appellant's police interviews. In the first interview, appellant initially denied going into the room where Taylor was sleeping but eventually admitted, "All I did was push her off the bed." Appellant stated that Taylor "moaned when I pushed her; after that, she never made a sound." She later clarified that Taylor "made a sound when she hit the floor." Appellant told the interviewing officer that there were a lot of toys on the floor where she pushed Taylor, and that Taylor's head may have hit a toy.

Appellant stated that she then grabbed Taylor by the shoulders and "threw her back on the bed."

Regarding the push itself, the officer asked appellant, "Now, you come in, a little pissed off, and you push her off the bed?" Appellant responded, "Yeah, I hate to say it." Appellant explained that Taylor was laying with her head towards appellant and crossways across the bed, and that, when appellant pushed Taylor, her body rotated through 90 degrees until Taylor went head-first off the back side of the bed. Appellant stated, "Now, you push her hard enough this way, she's gonna roll." When asked whether she used her feet or hands to push Taylor off the bed, appellant responded, "my hands, I did use both."

In the second interview, the officer asked appellant, "At some point you go in the room where Taylor is asleep, and you're upset, and you said you shoved Taylor off the bed?" Appellant responded, "I did, right up above, like, her shoulder area." Appellant said that when she pushed Taylor off the bed, "[Taylor] was a little top first." Appellant later clarified that, when she pushed Taylor off the bed, Taylor fell head-first onto the back of her head, "not face-down."

Appellant offers several specific reasons why she contends the evidence is legally insufficient to support the verdict.

■ First, appellant contends that there is insufficient evidence that she acted recklessly because there is no evidence that appellant, as a lay person, understood there to be a substantial and unjustifiable risk that Taylor would die from being pushed off the bed. This assessment is an incorrect application of the required mental state.

■ Injury to a child is a result-oriented offense, meaning that the actor must intend to cause the result of the actor's conduct, not just to engage in the conduct that causes the result. *See Cleburn v. State*, 138 S.W.3d 542, 545 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). "In other words, injuring a child is not a criminal act unless the actor intended to cause the injury." *Schultz v. State*, 923 S.W.2d 1, 4 (Tex. Crim. App. 1996). The injury to a child statute requires that the accused intend bodily injury generally—it does not require the State to prove that the accused intended the specific injury that resulted or that the accused had knowledge that the exact injury would result. *See generally* Tex. Penal Code Ann. § 22.04(a). Accordingly, to convict appellant of reckless bodily injury to Taylor, the jury was required to find only that appellant was aware of but consciously disregarded a substantial and unjustifiable risk that Taylor would suffer bodily injury when appellant pushed her off the bed—not that appellant consciously disregarded a risk that the exact injury that caused Taylor's death would occur. *See id.*; Tex. Penal Code Ann. § 6.03(c).

The jury was presented with alternative explanations for the circumstances leading to Taylor's injury. The jury heard appellant's recorded statement that she pushed or shoved Taylor with both hands "hard enough" so that the child rotated through 90 degrees and headfirst off the bed. On the other hand, the medical examiner's testimony suggested that Taylor was thrown off of the bed. The jury rationally could have concluded that appellant consciously disregarded a substantial and unjustifiable risk that Taylor—a 36-pound four-year-old—would suffer bodily injury when appellant either threw her or shoved her with both hands off a standard height queen-sized bed head-first onto the floor. A rational jury could conclude that causing a sleeping child to hit the floor head-first

in this manner "constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances. . . ." *See* Tex. Penal Code Ann. § 6.03(c).

Appellant next argues that no rational jury could have concluded she was reckless when she used her hands to push Taylor off the bed because the trial court found that her hands were not a deadly weapon. This argument fails for two reasons.

■ First, the trial court had no legal authority to make a deadly weapon finding under the circumstances here; therefore, any such finding has no bearing on whether appellant committed the charged offense. *See Sanders v. State*, 25 S.W.3d 854, 856 (Tex. App.—Houston [14th Dist.] 2000, pet. dism'd) ("Since appellant was tried by a jury, the trial court had no authority to make a deadly weapon affirmative finding. . . . [I]t has been very well settled that in a jury trial, a trial court is authorized to enter a deadly weapon affirmative finding in three situations: where the jury has 1) found guilt as alleged in the indictment and the deadly weapon has been specifically plead as such using 'deadly weapon' nomenclature in the indictment; 2) found guilt as alleged in the indictment but, though not specifically plead as a deadly weapon, the weapon plead is per se a deadly weapon; or 3) affirmatively answered a special issue on deadly weapon use.").

Second, whether appellant's hands were a deadly weapon does not determine whether appellant disregarded a substantial risk that Taylor would suffer bodily injury when she was pushed or thrown head-first onto the floor or onto toys strewn across the floor. The same injury could have been inflicted regardless of whether appellant pushed (or threw) Taylor out of the bed with her hands or any other object.

Finally, appellant contends there is no evidence of any injury to Taylor. Appellant contends that the medical examiner "did not find any grossly observable injury to the child such as bruises, cuts, broken bones, etc.," and that the medical examiner "theorized that the child died by a unique and—to any lay person—unforeseeable sequence of events which left no observable evidence on the spinal cord itself."

The jury heard substantial testimony from the medical examiner regarding his theory of the cause of Taylor's death. The medical examiner discussed a hemorrhage he observed in a ligament in Taylor's spinal column, which he relied upon to support his finding that the odontoid process hyperflexed and impacted the spinal column. The medical examiner discussed hemorrhages he observed on Taylor's head, suggesting her head impacted something or was impacted by something. The medical examiner also discussed petechia—pinpoint hemorrhages from broken blood vessels—that he observed on Taylor's face, neck, and larynx. The medical examiner testified that he believed the petechia corroborated his theory of death because they could be caused if the diaphragm were paralyzed and blood was unable to leave the head and return to the rest of the body. The medical examiner explained that he observed hemorrhages in Taylor's sternocleidomastoid and paraspinous muscles, which was consistent with a violent hyperflexion of her head down to her chest. The medical examiner concluded that Taylor "was traumatized by her head slamming into something or her head being slammed by something, causing a hyperflexion injury causing the odontoid process—the ligaments to loosen up, the odontoid bone to slam into the . . . spinal cord, either stunning or injuring it, stopping her respirations immediately; and then she died from suffocation after that." The jury heard ap-

pellant's own interview in which she told the officer that Taylor moaned when she hit the floor, from which the jury reasonably could conclude that Taylor experienced pain from the fall caused by appellant's actions. This evidence, viewed in the light most favorable to the verdict, supports a finding that Taylor was injured.

Generally considering all the evidence in the light most favorable to the jury's verdict, we conclude a rational jury could have found that appellant recklessly caused serious bodily injury to Taylor. The jury watched appellant's recorded interview in which she admitted to police that she pushed Taylor off the bed because she was frustrated. The jury heard testimony from the medical examiner who performed the autopsy on the child's body that the cause of death was blunt force head trauma causing hyperflexion—an injury that the medical examiner testified could have been caused if Taylor were thrown off the bed and landed on the floor on the back of her head, but that could not have been caused if Taylor were "just sitting on a normal height bed and [fell] backwards." Taylor's injury required that "force be placed on [her]." Such an injury was consistent with appellant's testimony that Taylor fell headfirst onto the back of her head. Although appellant may not have anticipated or intended that Taylor would suffer the unique injury she did, the evidence nevertheless is sufficient to find that appellant intended some injury to come to Taylor when she pushed Taylor off the bed.

We conclude the evidence is legally sufficient to support the jury's verdict. Because we find that the jury was rationally justified in finding that appellant acted recklessly, we need not address appellant's contention that the evidence is legally in-

sufficient to support a finding on the lower culpable mental state of criminal negligence. See, e.g., Hicks v. State, 372 S.W.3d 649, 653 (Tex. Crim. App. 2012) (proof of a higher level of culpability constitutes proof of a lower level of culpability). Appellant's first and second issues are overruled.

## II. Medical Examiner's Testimony

In her third issue, appellant contends the trial court erred by admitting unreliable expert opinion testimony by the medical examiner.[1] Appellant contends that the medical examiner's opinion testimony was unreliable because he failed to look for certain evidence that might contradict his own theory of Taylor's cause of death.

### A. Standard of Review

A trial judge's ruling on the admissibility of expert testimony is reviewed under an abuse of discretion standard and will not be disturbed if the decision is within the zone of reasonable disagreement. Wolfe v. State, 509 S.W.3d 325, 335 (Tex. Crim. App. 2017). For expert testimony to be admissible, "the proponent of the expert scientific evidence must demonstrate by clear and convincing evidence that the testimony is 'sufficiently reliable and relevant to help the jury in reaching accurate results.'" Id. (quoting Kelly v. State, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992)). Because appellant challenges only the reliability of the medical examiner's testimony, we need not discuss whether the testimony was relevant in assisting the jury. See id. (limiting discussion to reliability prong where appellant did not challenge the relevancy prong).

To establish the reliability of scientific evidence, the proponent must prove

---

1. Appellant does not challenge the medical examiner's qualifications to offer expert testi- mony generally.

that (1) the underlying scientific theory is valid; (2) the technique applying the theory is valid; and (3) the technique was properly applied on the occasion in question. *Id.* at 336; *Kelly*, 824 S.W.2d at 573.

### B. Application

■ Appellant contends that the State failed to meet the reliability test's third prong by establishing that the medical examiner properly applied the pertinent scientific theory to the facts of the case. Specifically, appellant contends that the medical examiner neglected to "examine brain slides for evidence (e.g., meningitis) which might have spoiled his theory of wrongdoing by Appellant," and that the medical examiner reached his conclusion on Taylor's cause of death without having reviewed Taylor's previous pediatric records, thereby "completely discount[ing] the possibility of viral infection."

The defense's main argument at trial was that something other than appellant pushing Taylor off the bed may have caused Taylor's death. The defense argued that Taylor had experienced a number of medical problems during her life, and that she may have died as a result of meningitis or some other serious medical illness. In support of this argument, the defense presented its own expert witness, Dr. Radelat, who disagreed with some of the medical examiner's conclusions and opined that the medical examiner's autopsy was inadequate because it did not involve a microscopic inspection of the child's brain.

The medical examiner testified that he did not review Taylor's previous pediatric medical records because it was unnecessary in this case. He testified that, even if Taylor's records revealed that she had suffered multiple viral and bacterial infections during her lifetime, his opinion on her cause of death would not change because she had "a physical mechanical cause of death" that had "nothing to do with viral or infectious processes." The medical examiner testified that, if Taylor had any other illness sufficient to cause her to die suddenly, he would have seen signs of such an illness. The medical examiner testified that he could rule out infection in this case even without performing a microscopic examination of the brain because he would have observed infection when he performed his gross examination of the brain.[2] He testified that he did not find any evidence during the autopsy to suggest that the child had any such illness, and that from the autopsy it appeared that the child had been healthy.

Based on the foregoing evidence, the trial court could have concluded that the medical examiner's testimony was reliable despite his failure to inspect the brain microscopically or review the child's medical records. The defense was free to challenge the medical examiner's expert opinion through cross-examination and by presentation of its own expert testimony, both of which it did. *See Wolfe*, 509 S.W.3d at 336 (although the trial court serves as the gatekeeper of scientific evidence, that "does not supplant cross-examination as 'the traditional and appropriate means of attacking shaky but admissible evidence' ") (quoting *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 728 (Tex. 1998)).

Appellant's third issue is overruled.

### III. *Brady* and State Constitutional Due Process Claims

In her fourth and fifth issues, appellant contends that the trial court erred by de-

---

**2.** Similarly, Dr. Radelat was asked, "Is it possible to rule out infection or illness without looking at microscopic slides of brain tissue?" He responded, "You know, I think it's possible; but it's risky."

nying her motion to dismiss premised on the State's asserted withholding of exculpatory evidence.

## A. Standard of Review

 "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To establish a due process violation under *Brady*, a defendant must show that (1) the State failed to disclose evidence; (2) the evidence withheld was favorable to the defendant; and (3) the evidence is material, meaning there is a reasonable probability that, had the evidence been disclosed, the outcome of trial would have been different. *Pena v. State*, 353 S.W.3d 797, 809 (Tex. Crim. App. 2011).

## B. Application

 Appellant asserts that the State failed to timely make brain tissue and brain slides available to the defense. Appellant contends the tissue and slides may have demonstrated the existence of a brain illness that may have caused Taylor's death.

Initially, our review of the record indicates that no brain slides existed. The medical examiner testified at trial that he did not have slides made from the brain after the brain tissue was removed as part of the autopsy. The defense's expert, Dr. Radelat, likewise testified that there were no microscopic slides of the brain. Because there is no evidence that brain slides existed, appellant has not demonstrated that the State failed to disclose their existence.

The existence of brain tissue, on the other hand, was undisputed. The medical examiner testified that he sliced the brain and kept specimens of the brain, and Dr. Radelat testified that he viewed narrow slices of the brain and a portion of what he believed might have been the brain stem. Accordingly, considering that the existence of brain tissue is undisputed and that the defense's expert viewed the brain tissue, the only issue is whether the brain tissue was timely made available for examination. In that regard, a brief chronology of events is helpful.

The defense notified the State in October 2013 that "we may want additional testing so please notify the ME's office not to destroy any specimens retained from the autopsy." The State directed the medical examiner's office to preserve any specimens.

The case was dismissed before trial in October 2014, when the medical examiner's office could not locate slides created from portions of the child's body other than the brain, which appellant's expert asked to view less than two weeks before trial. These slides subsequently were located and appellant was re-indicted.

Appellant's trial counsel contacted the State in March 2015 and stated: "We need to schedule a time for Dr. Radelat to go to the ME's office to look at the evidence." The State responded, "Dr. Boor previously told me that Dr. Radelat can come view the slides at anytime. They just need maybe a day's notice. So whenever he is available should be fine."

Dr. Radelat went to the medical examiner's office to review the autopsy evidence about two weeks before the July 13, 2015 trial date. Dr. Radelat reviewed 17 slides of various tissues other than brain tissue; he asked whether there were any slides of the brain or any brain tissue available to review. The technician at the medical examiner's office was unsure, but said she would check and get back to him.

Dr. Radelat testified that appellant's trial counsel contacted him shortly before trial to see whether the medical examiner's office had determined if the office had brain tissue for his review. Dr. Radelat told appellant's trial counsel that he had not heard back from the medical examiner's office.

The office coordinator for the medical examiner's office testified that she checked with autopsy technicians after Dr. Radelat requested brain tissue and determined that brain tissue existed and had been preserved in a jar. The office coordinator testified that she called and left a message with appellant's trial counsel before the first day of trial stating that the medical examiner's office had brain tissue available for Dr. Radelat's review.

Dr. Radelat visited the medical examiner's office during trial and viewed the brain tissue before he testified. He requested that slides be prepared from the brain tissue. The State requested that brain slides be prepared pursuant to Dr. Radelat's request, but defense counsel subsequently halted the process. Dr. Radelat ultimately did not review any slides of the brain tissue.

In view of this record, appellant has not established the first element of her *Brady* claim because she has not demonstrated that the State withheld evidence or failed to timely produce evidence. Without knowing the defense's trial strategy, the State could not have known that there was any reason that appellant's expert witness needed to see the brain tissue. *See Harm v. State*, 183 S.W.3d 403, 407 (Tex. Crim. App. 2006) ("[T]he State is not required to seek out exculpatory evidence independently on appellant's behalf...."). The brain tissue itself was collected as a routine procedure during the autopsy, and the State instructed the medical examiner's office to preserve it upon the defense's

request in October 2013. At least as early as March 2015, the State informed appellant's trial counsel that her expert could view the available evidence on short notice. The defense's expert went to view the evidence two weeks before trial; upon determining that he wished to view brain tissue so that he could create brain slides, the medical examiner's office searched for and located the brain tissue. The defense was informed of its existence before the start of trial. Because the brain tissue was available to the defense long before trial had the defense's expert gone to review it, we cannot say that the State failed to disclose or produce it. *See id.* ("The District Attorney's Office ... maintained an open-file policy, which generally satisfies the prosecution's duty to disclose exculpatory evidence.").

Appellant contends the existence of specific evidence that appellant's expert sought to review—the brain tissue—was not made known to the defense until just before trial. The defense nonetheless was made aware of the brain tissue with sufficient time to request a continuance or to have its expert review the brain tissue. *See Little v. State*, 991 S.W.2d 864, 866-67 (Tex. Crim. App. 1999) ("If the defendant received the material in time to use it effectively at trial, his conviction should not be reversed just because it was not disclosed as early as it might have and should have been.... Little received the information in time to put it to effective use at trial, under his theory. He just neglected to do so.").

Moreover, even assuming disclosure of the existence of brain tissue was not timely, appellant has not satisfied the second or third prongs of the *Brady* test. *See Wilson v. State*, 7 S.W.3d 136, 146 (Tex. Crim. App. 1999) ("To prevail on his *Brady* claim, appellant must show that the State's tardy disclosure prejudiced him.... To

show prejudice, appellant must show a reasonable probability that, had the evidence been disclosed to the defense earlier, the result of the proceeding would have been different."). Although the brain tissue was made available, appellant's trial counsel prevented appellant's expert from reviewing it. Therefore, there is no evidence in the record that the brain tissue revealed the existence of any brain illness, meaning there is no evidence that the brain tissue evidence was favorable to appellant.

Likewise, appellant has not demonstrated that the outcome of trial would have been different had the existence of the brain tissue been disclosed earlier. Appellant was convicted of causing bodily injury to Taylor—not of killing Taylor. Appellant's own statement that Taylor moaned when she hit the floor indicates that Taylor was alive after appellant forcefully shoved her off the bed onto her head. Even if the evidence were to show that Taylor had a serious illness that may have killed her, appellant nevertheless admitted to committing the conduct of which she was convicted—recklessly causing bodily injury to a child. Accordingly, appellant has failed to demonstrate that the brain tissue would have changed the outcome of the trial. *See Pena v. State*, 353 S.W.3d at 809. We overrule appellant's fourth issue.

In her fifth issue, appellant asserts that Article 1, Section 9 of the Texas Constitution "affords greater protection than the Federal Constitution in regard to the preservation and availability of evidence." Appellant cites to a case from the Waco Court of Appeals for the proposition that the State has a duty to disclose not only exculpatory evidence, but also evidence that "is potentially useful to the defense." *Pena v. State*, 166 S.W.3d 274, 281 (Tex. App.—Waco 2005), *rev'd on other grounds*, 191 S.W.3d 133 (Tex. Crim. App. 2006). This court previously has declined to follow *Pena*. *See State v. Vasquez*, 230 S.W.3d 744, 751 (Tex. App.—Houston [14th Dist.] 2007, no pet.). Accordingly, we overrule appellant's fifth issue.

### CONCLUSION

Having overruled appellant's issues, we affirm the trial court's judgment.