**Affirmed and Memorandum Opinion filed August 27, 2024.**



In The

# Fourteenth Court of Appeals

---

**NO. 14-23-00215-CR**
**NO. 14-23-00216-CR**

---

**RODOLFO PENA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 461st District Court**
**Brazoria County, Texas**
**Trial Court Cause Nos. 92200-CR & 92330-CR**

---

## MEMORANDUM OPINION

Appellant Rodolfo Pena appeals his conviction for evading arrest with a vehicle in case number 14-23-00215-CR (92200-CR) and his conviction for murder in case number 14-23-00216-CR (92330-CR). He contends the evidence is legally insufficient to support his convictions. We affirm.

### BACKGROUND

After Appellant killed his stepson, discarded the firearm, and fled the scene

by car on February 6, 2021, he was indicted for murder in cause number 92330-CR and for evading arrest with a vehicle in cause number 92200-CR. A jury trial was held on March 27, 28, and 29, 2023. At trial, numerous witnesses testified, including Complainant's mother and son as well as several police officers, investigators, and a medical examiner. The evidence showed the following.

Appellant and Jennifer had been a couple for 23 years; together they had an adult daughter Olivia. Jennifer had two sons from a previous relationship: twenty-nine-year-old Complainant Osvaldo and twenty-seven-year-old James. On February 6, 2021, Jennifer planned a birthday party for her son James, who was at Appellant's and Jennifer's house with James's two young sons. Olivia arrived around 7 p.m. Thereafter, Complainant arrived with his three sons: twelve-year-old Michael, ten-year-old Gabriel, and eight-year-old Joshua. Complainant's wife Thelma arrived a little later. Jennifer testified that there was barbecue in the backyard, "music was playing, and there was some drinks." She gave Complainant a bottle of Jack Daniels because "he had just had a birthday also."

Appellant returned from a visit with his mother around 8 p.m. He saw the Jack Daniels bottle and stated, "I'm not going to drink because something bad always happens when I drink;" nonetheless, he started drinking Jack Daniels from the bottle. Appellant then made derogatory comments in Spanish about Jennifer and Olivia, which Thelma heard and translated for Jennifer. Complainant started arguing with Appellant, telling Appellant that he was tired of Appellant always calling his mother names and putting her down. Olivia and Thelma also started arguing.

Jennifer went to the barbecue pit in the backyard. When she turned to look through the window, she saw Thelma and Olivia fighting and punching each other in the living room. Jennifer also saw Appellant "come around the counter and he jumped on [Complainant]'s back and got him in a chokehold. [Jennifer] came

2

inside" and saw Complainant flip Appellant over onto the floor and start hitting Appellant. Thereafter, "James came out of the room and asked everybody, 'What are y'all doing? Stop.'" Olivia and Thelma continued arguing, but Complainant stopped hitting Appellant and "got up off of" Appellant. Appellant "jumped up off the floor and went to the bedroom."

Jennifer testified that when Complainant "got up off of [Appellant], he said "Come on, everybody. Let's go. And Michael was getting the kids ready to put [them] in the truck to leave since they were all leaving[:] [Complainant], Thelma, Michael, Joshua, and Gabriel." Jennifer testified that "since there was still some arguing going on with Olivia and Thelma, it took a couple of minutes for them to get all the kids and stuff together and then I had my dog running in and out." Michael had taken his brothers to the truck and was walking back towards the house while Thelma, Complainant, Jennifer, and Olivia were in the hallway walking toward the front door. As they were walking, they heard a click. Jennifer testified that she, Olivia, and Complainant turned around "to see what the click was and [Appellant] was standing there with a gun and he pointed the gun, he shot [Complainant]. I was looking him in his face when he shot the gun. I saw the fire come out of the gun." Complainant crawled to the front patio area and collapsed.

Jennifer testified she saw Appellant running to their bedroom and then running outside into the backyard trying to open the fence. In the meantime, James and Michael called 9-1-1. Police Officer Holmes arrived within a few minutes and performed CPR on Complainant. While everyone was in the front of the house concerned with Complainant, Appellant ran to his Dodge Challenger parked outside by the driveway. At that time, Officer Holmes's partner, Officer Lugo, arrived at the scene. Officer Lugo saw her partner running after the Challenger and heard him instruct her to stop Appellant's car. Officer Lugo reversed her police car to block

3

Appellant in, but Appellant went around her car and fled the scene.

Officer Lugo and officers from other police departments pursued Appellant for 26 minutes. Appellant led them on a high-speed chase through several jurisdictions. The police had to deploy spike strips and, even then, Appellant continued fleeing for several minutes until he stopped at a mobile home park. He attempted to flee on foot, but he was apprehended and taken into custody. Officer Mezzino, who assisted in the pursuit of Appellant, confirmed that he, Officer Lugo, and another police officer had been pursuing Appellant for 26 minutes at speeds of up to 124 m.p.h. before Appellant finally came to a stop at a mobile home park. Officer Mezzino's in-car video recording showed the speed at which police had to drive to catch Appellant.

Complainant's son Michael also testified at trial and confirmed much of Jennifer's testimony. He stated that his family was at Jennifer's and Appellant's home for his uncle's birthday party. Complainant drank one beer but Appellant and Olivia were drinking whiskey out of a bottle. The argument started when Appellant said "something about [Michael's] grandma" and then something about Michael's mother Thelma, which upset Complainant.

Because his two brothers were upset about the argument, Michael took them to the truck and then returned to the house. He did not see who took the first swing, but he stated that Complainant was on top of Appellant and hitting Appellant. Michael stated that Olivia and Thelma also were fighting; Olivia was pulling Thelma's hair and Michael had to pull Olivia off of Thelma. Complainant and Appellant stopped fighting at the time.

Michael testified that he and his parents started leaving, but that he went outside ahead of them to put one of his brothers back into the car because he "got out the car." After Michael took his brother to the car, Michael turned around

4

looking toward the front door. He saw Appellant pointing a gun at Complainant's back as Complainant, Thelma, and Jennifer were walking toward the front door. Michael saw Appellant shooting Complainant as Complainant was trying to leave the house and Complainant falling into the flowerbed. Michael testified that he had called 9-1-1 trying to get an ambulance for his dad. While he was calling for help, Michael observed Appellant get into his Challenger and drive away. Michael testified that same night while at the hospital, he found out his dad had died.

Chief medical examiner Barnhart testified that Complainant died from a gunshot wound. The bullet entered Complainant's left chest; struck his heart, esophagus, diaphragm, and liver; and exited on his right flank. Barnhart testified that the direction the bullet travelled is consistent with a scenario in which a person "faced straight and then turned around just slightly."

After hearing the evidence, the jury (1) found Appellant guilty of murder; (2) found Appellant caused Complainant's death under the immediate influence of sudden passion; (3) found true two enhancement (habitual offender) paragraphs in the indictment; and (4) assessed Appellant's punishment at life imprisonment. The jury also (1) found Appellant guilty of evading arrest with a vehicle; (2) found two enhancement (habitual offender) paragraphs in the indictment true; and (3) assessed Appellant's punishment at 25 years' confinement, with the sentences to run concurrently. Appellant filed timely notices of appeal.

ANALYSIS

On appeal, Appellant challenges the legal sufficiency of his convictions for murder and evading arrest with a vehicle.

## I.     Standard of Review

The legal sufficiency standard of review is the only standard we apply in

determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("[T]his Court now applies only one standard 'to evaluate whether the evidence is sufficient to support a criminal conviction beyond a reasonable doubt: legal sufficiency.'"); *Kolb v. State*, 523 S.W.3d 211, 214 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd).

For this review, we consider the combined and cumulative force of all admitted evidence and any reasonable inferences therefrom in the light most favorable to the verdict to determine whether the jury was rationally justified in its decision. *Johnson v. State*, 509 S.W.3d 320, 322 (Tex. Crim. App. 2017); *Kolb*, 523 S.W.3d at 214. Direct evidence and circumstantial evidence are equally probative; circumstantial evidence alone may be sufficient to uphold a conviction so long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015).

The jury is the exclusive judge of the facts and the weight to be given to the testimony of witnesses. *Temple*, 390 S.W.3d at 360; *Bartlett v. State*, 270 S.W.3d 147, 150 (Tex. Crim. App. 2008). "The jury, being the judges of the facts and credibility of the witnesses, could choose to believe or not believe the witnesses, or any portion of their testimony." *See Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986) (en banc); *see also Henderson v. State*, 29 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) ("Even when a witness's testimony is uncontradicted, the jury can choose to disbelieve a witness.").

## II.    Murder

Challenging his murder conviction, Appellant contends there is insufficient evidence to (1) support a finding that he possessed the required culpable mental state to commit murder; and (2) reject his self-defense claim.

### A. Mens Rea

We begin by addressing Appellant's contention that "the evidence presented by way of family members" was legally insufficient to prove that "Appellant had any intent, nor the *mens rea* to commit murder."

### 1. Applicable Law

Under the Texas Penal Code, as relevant here, a person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See* Tex. Penal Code Ann. § 19.02(b)(1), (2). A person acts "intentionally" with respect to the nature or result of his conduct "when it is his conscious objective or desire to engage in the conduct or cause the result." *Id*. § 6.03(a). A person acts "knowingly" with respect to a result of his conduct "when he is aware that his conduct is reasonably certain to cause the result." *Id*. § 6.03(b).

When, as in this case, the charge presents two legal theories of murder — intentionally or knowingly causing death or intending to cause serious bodily injury and committing an act clearly dangerous to human life that causes death — the theories are alternative manners and means of committing the offense of murder, rather than distinct offenses. *Braughton v. State*, 522 S.W.3d 714, 727-28 (Tex. App.—Houston [1st Dist.] 2017), *aff'd*, 569 S.W.3d 592 (Tex. Crim. App. 2018); *see Aguirre v. State*, 732 S.W.2d 320, 326 (Tex. Crim. App. [Panel Op.] 1982) (en banc) (op. on rehearing). Thus, when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the guilty verdict will be upheld if the evidence is sufficient on any of the theories. *Hooper v. State*, 214 S.W.3d 9, 14 (Tex. Crim. App. 2007).

A culpable mental state must often be proven by circumstantial evidence, which is just "as probative as direct evidence in establishing the guilt of an actor." *See Temple*, 390 S.W.3d at 359; *Pitonyak v. State*, 253 S.W.3d 834, 844 (Tex. App.—Austin 2008, pet. ref'd); *Mouton v. State*, 923 S.W.2d 219, 223 (Tex. App.—Houston [14th Dist.] 1996, no pet.). A jury may infer intent or knowledge "from any facts which tend to prove its existence, including the acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002) (en banc); *see Mouton*, 923 S.W.2d at 223.

Further, a "jury may infer the intent to kill from the use of a deadly weapon unless it would not be reasonable to infer that death or serious bodily injury could result from the use of the weapon." *Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996); *Ross v. State*, 861 S.W.2d 870, 873 (Tex. Crim. App. 1992) (en banc). A handgun is a deadly weapon per se. Tex. Penal Code Ann. § 1.07(a)(17)(A); *Braughton*, 522 S.W.3d at 728; *Mouton*, 923 S.W.2d at 223. To determine culpability for an offense, the jury also is entitled to consider events that occurred before, during, and after the commission of the offense. *Mouton*, 923 S.W.2d at 223.

### 2. Discussion

Here, evidence showed that after Appellant and Complainant stopped fighting, Appellant went to retrieve a handgun. As Complainant and his family were leaving the house and while they had their backs turned to Appellant, Appellant pointed a gun at Complainant's back. Complainant, Jennifer, and Olivia heard "a click" and only turned around to see what the "click" was. When they turned around, Appellant was standing close by in the living room; he was pointing a gun at Complainant and then shot Complainant. The court of criminal appeals has stated that "pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Rodriguez v. State*, 629 S.W.3d 229, 234 (Tex.

Crim. App. 2021); *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005).

Appellant asserted in his police interview that (1) he only got the gun to scare Complainant[1]; (2) he was not "intending to hit [Complainant] but it happened"; (3) he was in the living room facing the kitchen and Complainant "jumped out at him" so he turned around with the gun and the gun "went off"; and (4) he "did it, not intentionally but [he] still did it." However, for several reasons, the jury was free to disbelieve Appellant's statements that he did not intend to shoot Complainant and that the gun just went off after Complainant "jumped him."

First, Michael and Jennifer testified that Complainant was leaving the house, had his back turned to Appellant, and was unaware that Appellant was pointing a gun at him while he was trying to leave the house, thus controverting Appellant's assertion that (1) Complainant "jumped out at him"; (2) Appellant was facing the kitchen while standing in the living room; and (3) the gun "went off" as Appellant turned around with the gun after Complainant "was coming at" Appellant. Second, based on Corporal Mayfield's testimony,[2] a firearm "will not fire unless the trigger is pulled" and "there has to be some sort of pressure applied to the trigger", thus controverting Appellant's claim that his firearm "just went off." Third, Appellant also stated during his interview that he shot at Complainant when Complainant "jumped out at him" thereby admitting he pulled the trigger and contradicting his contention that the gun "just went off." Fourth, the jury could consider the following statements Appellant made during the interview: "I screwed up" and "I shouldn't have gone that far for no reason . . . it wasn't like he was an intruder or something."

---

[1] Appellant stated: "I got it to scare him, I guess" and "I was just trying to scare him or something like that."

[2] Corporal Mayfield was one of the police officers who testified at trial.

Additionally, the jury could have inferred an intent to kill from Appellant's behavior after the shooting. *See Pitonyak*, 253 S.W.3d at 844; *Mouton*, 923 S.W.2d 219 at 223. The jury reasonably could have concluded that a stepdad who had unintentionally shot his stepson would not have discarded his firearm, fled the scene, led the police on a 26-minute high-speed chase but would have stayed with his family and attended the victim who had been his stepson for 23 years.

Viewing the evidence in the light most favorable to the jury's finding, we conclude that a rational jury could have found that Appellant intentionally or knowingly caused Complainant's death. The evidence is therefore legally sufficient to support the jury's finding that Appellant acted with the required mental state to commit murder. We overrule Appellant's issue with regard to his mens rea argument.

## B.     Self-Defense

We next address Appellant's argument that there is legally insufficient evidence to support the jury's rejection of his self-defense claim because he "was placed in a hostile situation in the moments before the shooting."

### 1.     Applicable Law

The Texas Penal Code provides that deadly force used in self-defense is a defense to prosecution for murder if that use of force is "justified." *See* Tex. Penal Code Ann. §§ 9.02, 9.31-.32; *Harris v. State*, 668 S.W.3d 83, 88 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd). Section 9.31 provides that, subject to certain exceptions, a person is justified in using force against another "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." Tex. Penal Code Ann. § 9.31(a). The use of force is not justified in response to verbal

provocation alone, or if the actor provoked the other's use or attempted use of unlawful force. *Id*. § 9.31(b). A "reasonable belief" means a belief "that would be held by an ordinary and prudent man in the same circumstances as the actor." *Id*. § 1.07(a)(42).

A person is justified in using deadly force against another (1) if he would be justified in using force against the other under section 9.31, and (2) "when and to the degree the actor reasonably believes the deadly force is immediately necessary: (A) to protect the actor against the other's use or attempted use of unlawful deadly force, or (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery." *Id*. § 9.32(a).

In a claim of self-defense justifying a defendant's use of deadly force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Braughton*, 569 S.W.3d at 608; *Zuliani*, 97 S.W.3d at 594. In contrast, the State's burden of persuasion is not one that requires the production of evidence; rather, it requires only that the State prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608; *Zuliani*, 97 S.W.3d at 594.

Therefore, in reviewing the sufficiency of the evidence to support a conviction for murder when the jury has rejected a defendant's claim of self-defense, we determine whether, after viewing all of the evidence in the light most favorable to the verdict, any rational jury would have found the essential elements of murder beyond a reasonable doubt and also would have found against the defendant on the

11

self-defense issue beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 609; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc).

### 2. Discussion

In this case, the evidence showed that Appellant escalated the verbal argument between him and Complainant when he jumped on Complainant's back and put Complainant in a chokehold, prompting Complainant to flip Appellant on his back and start hitting Appellant. After James asked everyone to stop fighting, Complainant stopped and told his family: "Come on, everybody. Let's go." Jennifer testified that "Michael was getting the kids ready to put [them] in the truck to leave since they were all leaving." Jennifer stated that "since there was still some arguing going on with Olivia and Thelma, it took a couple of minutes for them to get all the kids and stuff together." While Complainant and his family were getting ready to leave the house, Appellant went to a restroom to retrieve a gun he had hidden there.

Jennifer testified that Michael had taken his brothers to the truck and was walking back towards the house while she, Complainant, Thelma, and Olivia were in the hallway walking toward the front door. Jennifer testified that as they were walking, they heard a click and turned around "to see what the click was and [Appellant] was standing there with a gun and he pointed the gun, he shot [Complainant]." Michael confirmed that Appellant was pointing a gun at Complainant's back as Complainant, Thelma, and Jennifer were walking toward the front door. Michael saw Appellant shoot Complainant as Complainant was trying to leave the house. Michael testified that Complainant did not "realize he has a gun pointed at him" because he had his back turned to Appellant.

At the time of the shooting, testimony showed there was no contact between Complainant and Appellant and they were at least several feet away from each other

12

with Complainant having his back turned to Appellant and trying to leave the house. Testimony also showed that Complainant did not threaten, talk to, or in any way interact with Appellant since their fight had finished minutes earlier and Appellant went to retrieve his gun. Although Appellant claimed that Complainant tried to "jump him" before he shot Complainant, this assertion was negated by Jennifer's and Michael's testimony, and we may not re-evaluate the weight and credibility of the evidence or substitute our judgment for that of the factfinder. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *see also Henderson*, 29 S.W.3d at 623 ("Even when a witness's testimony is uncontradicted, the jury can choose to disbelieve a witness."). Thus, the jury rationally could have found there was no evidence of a threat of imminent, physical, serious bodily injury to Appellant.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude there was legally sufficient evidence supporting the jury's rejection of Appellant's claim of self-defense. Accordingly, we overrule Appellant's issue challenging his murder conviction.

## III. Evading Arrest

Challenging his conviction for evading arrest with a vehicle, Appellant contends there is legally insufficient evidence to support the jury's finding that he "knew the officer was attempting to arrest or detain him."

### A. Applicable Law

As applicable here, to hold that evidence is legally sufficient to sustain a conviction for evading arrest or detention with a vehicle, the evidence must demonstrate that the defendant, while using a vehicle, intentionally fled from a person he knew to be a peace officer attempting lawfully to arrest or detain him.

*Redwine v. State*, 305 S.W.3d 360, 362 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see* Tex. Penal Code Ann. § 38.04. A person "flees" by giving anything less than prompt compliance with an officer's direction to stop. *Lopez v. State*, 415 S.W.3d 495, 497 (Tex. App.—San Antonio 2013, no pet.). A person violates section 38.04 only if he knows a police officer is attempting to arrest him but nevertheless refuses to yield to a police officer's show of authority. *Redwine*, 305 S.W.3d at 362; *Hobyl v. State*, 152 S.W.3d 624, 627 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd). "Proof that an officer in a vehicle is attempting to arrest or detain a person generally consists of the officer displaying authority by the use of overhead/emergency lights and siren." *Duvall v. State*, 367 S.W.3d 509, 513 (Tex. App.—Texarkana 2012, pet. ref'd).

**B.    Discussion**

Here, evidence showed that Officer Lugo arrived at the scene when Appellant ran to his vehicle to flee. Officer Holmes was running after Appellant's vehicle and "was yelling at [Officer Lugo] to stop that car." Officer Lugo testified that she saw Appellant in his Challenger, made eye contact with Appellant, and tried to block Appellant. She also testified: "My overhead lights were on on my unit, and I reversed my unit in front of his because he was attempting to . . . leave the residence and go behind me. So the lights were on and I reversed my unit in an attempt to block him in . . . . My intention was to block him in to keep him from going around me, and he still went around me."

Because she was unsuccessful in preventing Appellant from leaving the scene, Officer Lugo turned her police car around, "activated [the] siren, indicating that [she] wanted him to stop." Appellant did not stop his vehicle; instead, he led Officer Lugo and police officers from other departments on a 26-minute high-speed chase through several jurisdictions. To stop Appellant, police had to deploy spike strips but

14

Appellant continued to flee for several minutes until he stopped at a mobile home park. After exiting his vehicle, he attempted to flee on foot but was apprehended by police and taken into custody. Officer Mezzino, who assisted in pursuing Appellant, confirmed that he, Officer Lugo, and another police officer had been pursuing Appellant for 26 minutes at speeds of up to 124 m.p.h. before Appellant finally came to a stop at a mobile home park.

Based on this evidence, it was reasonable for the jury to conclude that Appellant was aware that Officer Lugo and other officers were attempting to arrest or detain him. *See Lopez*, 415 S.W.3d at 497 ("From the officers' testimony that their lights and sirens were activated for 0.6 miles or approximately one and one-half minutes, the jury could reasonably infer that Lopez was aware the officers were attempting to detain him but intended to flee . . . ."); *Duvall*, 367 S.W.3d at 513 ("Proof that an officer in a vehicle is attempting to arrest or detain a person generally consists of the officer displaying authority by the use of overhead/emergency lights and siren."); *see also Lopez v. State*, No. 04-17-00359-CR, 2018 WL 3747817, at *2 (Tex. App.—San Antonio Aug. 8, 2018, no pet.) (mem. op., not designated for publication) (finding jury reasonably concluded that "Lopez was aware Leal was attempting to detain or arrest him" when the "dashcam video and Leal's testimony established that Leal had both his overhead lights and sirens activated for forty-five seconds while in pursuit of Lopez").

Appellant claims that the testimony of Officers Lugo and Mezzino was "conclusory" and "not persuasive." However, the jury as the sole judge of the witnesses' credibility was free to believe Officers Lugo and Mezzino. *See Green v. State*, 607 S.W.3d 147, 152 (Tex. App.—Houston [14th Dist.] 2020, no pet.). Additionally, the high-speed chase was recorded by Officer Mezzino's in-car camera and played for the jury.

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's credibility and evidentiary assessments, the jury rationally could have found that Appellant intentionally fled from Officer Lugo, a peace officer who Appellant knew was attempting to lawfully arrest or detain him. Therefore, we conclude the evidence is legally sufficient to support Appellant's conviction for evading arrest with a vehicle. Accordingly, we overrule Appellant's issue challenging his evading arrest with a vehicle conviction.

## CONCLUSION

We affirm the trial court's judgment in case number 14-23-00215-CR (92200-CR) and case number 14-23-00216-CR (92330-CR).

/s/ Meagan Hassan
Justice

Panel consists of Justices Wise, Spain, and Hassan.

Do Not Publish — Tex. R. App. P. 47.2(b).