

# NUMBERS 13-21-00196-CR & 13-21-00197-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

PATRICIA DIANNE JOHNSON,                                    **Appellant,**

**v.**

THE STATE OF TEXAS,                                           **Appellee.**

## On appeal from the 24th District Court
## of DeWitt County, Texas.

## MEMORANDUM OPINION

### Before Justices Longoria, Hinojosa, and Silva
### Memorandum Opinion by Justice Hinojosa

A jury found appellant Patricia Dianne Johnson guilty of injury to a child causing serious bodily injury to a child fourteen years of age or younger, a first-degree felony, *see* TEX. PENAL CODE ANN. § 22.04(e), and aggravated assault with a deadly weapon, *see id.* § 22.02, a second-degree felony. The jury sentenced Johnson to two concurrent sentences of fifteen years' incarceration in the Texas Department of Criminal Justice,

Institutional Division.

By two issues, Johnson argues the evidence was insufficient to show that she intentionally or knowingly (1) intended to cause serious bodily injury to a child, her niece T.D.[1], or (2) intended to scare her nephew A.M. by use or exhibition of a deadly weapon. We affirm.

## I.    BACKGROUND

Trial began on June 9, 2021. The following witnesses testified.

### A.    T.D.

T.D. testified that Johnson is her maternal aunt. At the time of the incident made the basis of these charges, T.D. was thirteen years old and living in a family violence shelter with her brother A.M. and mother Pamela Johnson (Pamela).[2] T.D. recalled that her mother called Johnson on the morning of August 25, 2018, and asked if she, her children, and Pamela's friend Marion Kuykendall could go visit her home. Johnson agreed. When T.D. arrived with her family, she and her brother went inside the home while her mother stayed outside visiting with Johnson and Kuykendall.

T.D. testified that she and A.M. were both sitting on the couch using their respective phones when they began arguing and "trash-talking" each other, cussing and calling each other names. At that moment, Johnson walked in and heard A.M. call T.D. a derogatory term. Johnson admonished A.M. for speaking to T.D. that way. In response,

---

[1] We use initials to protect the identities of the minors. *See Salazar v. State*, 562 S.W.3d 61, 63 n.1 (Tex. App.—Corpus Christi–Edinburg 2018, no pet.) (noting that the comment to Texas Rule of Appellate Procedure 9.8 does "not limit an appellate court's authority to disguise parties' identities in appropriate circumstances . . .").

[2] We will refer to this witness by her first name as she shares the same surname as the appellant.

A.M. began using similar language against Johnson. The fight between A.M. and Johnson escalated. T.D. stated that Johnson became angry and ultimately pulled a shotgun from behind the table near the front door. Johnson then put the gun against A.M.'s forehead. T.D. testified that A.M. began crying. T.D. was attempting to record what was happening on her phone.[3] She then looked down at her phone and "heard a noise go off." She looked up from her phone, saw smoke, and realized that her leg was hurting. She "pulled up [her] shorts . . . and [she] looked at [her] leg, and there was a hole in [her] leg." T.D. had been shot. The gun wound was at the top of her thigh, approximately the size of a golf ball, burning, and bleeding.

T.D. recalled that her mother rushed into the home at that time and "start[ed] freaking out." T.D. remembered that Johnson gathered sheets to stop and clean the flow of blood. T.D. stated that she laid down for about ten minutes until law enforcement arrived. She recalled an officer wrapping a tourniquet around her leg to slow the bleeding. T.D. testified that she was transported to University Hospital in San Antonio via Life Flight, where she spent nearly a month in recovery. She had to re-learn to walk because the gunshot wound damaged the muscles in her thigh. She used a walker to ambulate for weeks and now has an 8-inch scar from the wound. She testified that, three years later, she still has pain in her leg.

T.D. stated that, at the hospital, she and A.M. agreed that they had to cover up what really occurred because they did not want Johnson to get into trouble.

---

[3] T.D. reported that she later deleted this video because she did not want to re-live the occurrence.

**B.    Susannah Nicholson, M.D.**

Susannah Nicholson, M.D. is an associate professor of trauma surgery and critical care at the University of Texas Health Science Center in San Antonio, Texas. Dr. Nicholson was the physician on call when T.D. arrived at University Hospital via Life Flight. Dr. Nicholson testified that there was an immediate concern about T.D.'s blood loss given that the wound was near her femoral artery and femoral vein. Dr. Nicholson stated that T.D. had a CT scan which "showed a number of pellets in the thigh . . . around the blood vessels." The medical team determined that a pellet had traveled through her vein, into the vena cava into her heart, and lodged into the periphery of her lung. The medical team then performed an angiogram to better assess any damage to T.D.'s blood vessels from the shotgun pellets.

Dr. Nicholson performed the initial debriding surgery to clean and wash T.D.'s gunshot wound. Dr. Nicholson removed the actual shotgun casing, which measured at 10-by-15-by-12 centimeters, and all devitalized or dead tissue. She acknowledged that this gunshot wound created a "substantial risk of death," "serious permanent disfigurement," or "protracted loss or impairment of the function of any bodily member or organ." Dr. Nicholson testified that T.D. ultimately needed six or seven surgeries during her hospital stay to continue to debride the wound. She also stated that T.D. received physical therapy, occupational therapy, and psychiatric counseling during her stay.

**C.    A.M.**

A.M. testified that he was fourteen years old at the time of the incident. His family went to visit his aunt, Johnson. He recalled that he and his sister entered his aunt's home

and sat on a couch together. Both were on their phones playing games when he and his sister began to bicker. His mother came in to stop the argument but then returned outside; the siblings began bickering again. A.M. stated that Johnson then came in and heard him call his sister names. Johnson scolded him and he began arguing with Johnson directly. A.M. recalled that the fight with his aunt "escalated" and she grabbed a gun from behind the door. He stated, "[s]he walked up to me and put it to the top of my forehead . . . and then cocked it back." He remembered seeing her finger on the trigger, as the gun was only two feet away from his line of vision. A.M. stated that at that moment his mother began walking back into the home. A.M. used that distraction to slap the barrel of the gun down. The gun subsequently went off and T.D. was shot. A.M. recalls that his sister began screaming in pain. He said that he tried to run to his mother but that Johnson blocked and "charg[ed]" at him, grabbing his throat. He recalls his aunt choking him until he could escape and run outside.

A.M. stated that later, at the police station, his mother asked him to lie to the police. "She said to act like I was just playing with a gun, that I was playing with a gun and I shot [T.D.]." A.M. stated that he feels responsible for his sister getting shot because he "shouldn't have put her in that position."

## D.    Pamela Johnson

Pamela, the mother of T.D. and A.M., testified that she comes from a large family—seven boys and three girls. She stated that Johnson is her second oldest sister and is approximately ten years older than her. She also shared that, prior to these events,

5

Johnson was her best friend too.

Pamela was living in a domestic violence shelter with her children at the time of the shooting. She recalled that she wanted to take a break from the shelter's "locked-down" environment to relax for the day, so she called Johnson to see if they could visit her: Johnson lived in a trailer home in the country and had horses that her children liked to see. Johnson agreed, so Pamela asked her friend Kuykendall for a ride to her sister's house. She and Kuykendall took a "few beers" to sit outside under the shade of trees to relax.

Pamela recalled that when they arrived, the children went inside with their phones to watch television. She and Kuykendall stayed outside, setting up chairs and a picnic blanket. Later, Pamela went into the house and was shocked to see her sister holding a shotgun to her son's head. Pamela testified that Johnson seemed to be "in a trance" so she called her sister's name three times. The first and second times Pamela called her name, Johnson did not respond. Pamela stated that she "didn't want to just touch [Johnson] because [she] was scared that the gun would go off." The third time Pamela called Johnson's name, Johnson looked at Pamela. When Johnson looked toward Pamela, A.M. slapped the gun down and the gun went off, injuring T.D.

Pamela admitted that she told her children and Johnson to lie about what happened to the police because she loved her sister and did not want her to be in trouble. She testified that Johnson had been recently widowed and was still grieving. She also revealed that A.M. had ADHD and oppositional defiance disorder, conditions for which he was taking medication. These diagnoses mean that A.M. is sometimes prone to

6

aggressive outbursts and can struggle to control his behavior or language.

**E.     James Cockroft**

James Cockroft, deputy sheriff for the DeWitt County Sheriff's Office, testified that he received a call that a "[thirteen]-year-old female had been shot in the leg with a .22" at approximately 4:30 p.m. on August 25, 2018. When he arrived, he saw two individuals on the porch. He entered the premises, saw T.D lying on the floor holding her bleeding leg, and immediately took his tourniquet out and applied it to her leg. After EMS arrived and prepared T.D. for her flight to San Antonio, Cockroft re-entered the home and secured the shotgun for evidence. He stated that the "shotgun had a recently fired round" because when he opened the firearm, he saw a small amount of smoke emanating from it and a spent casing. He placed the firearm in the back of his vehicle for transport to the sheriff's office.

Cockroft explained how the shotgun operated through his testimony. He testified that you cannot shoot the gun without pulling the hammer back. When the prosecutor asked, "And then after I pull the hammer back, if I truly want to shoot the gun, I pull the trigger?", he answered, "That's correct." Cockroft stated that he knew that T.D.'s gunshot wound did not result from an accidental shooting because of the angle of her wound.

**F.     Nicole Carver**

Nicole Carver, an investigator for the Texas Department of Family and Protective Services (CPS), testified that she spoke with Pamela on August 28, 2018, three days after the incident. She stated that Pamela was initially not forthcoming regarding what occurred but that that is common because often parents "are too worried that they're

going to get their kids taken [a]way from them."

Carver later spoke with Johnson, who explained that Pamela and the children were visiting her when she came upon T.D. and A.M. fighting. Johnson told Carver that A.M. "was cussing out his sister and calling her a bitch, a whore, and a motherf[–]cker." Johnson told A.M. to "shut up and quit disrespecting his sister." Johnson "started threatening him saying that she had a gun" when A.M. allegedly told Johnson "that he was going to slap the teeth out of her mouth."

Carver then told Johnson what A.M. reported to a fellow CPS investigator. Carver stated that A.M. said that Johnson then picked up the gun in the corner, pointed it at A.M., and "pulled the hammer back while it was in his face." A.M. then reported that:

> . . . [t]he barrel touched his face, and he was a little scared. He said he told her to get the barrel/gun out of his face, and then she started cussing at him. She got too close, and he grabbed the gun with both of his hands fast, and that's when the gun went off.

Johnson admitted to Carver that "she didn't know why it happened like that," "she didn't mean for it to happen like that," and "[s]he just wanted to scare him." She also admitted that she did not like T.D. and A.M. "because they were bad kids." Johnson told CPS, "I don't mess with them kids because they have problems."

## G.    The Jury Charge, Verdict, and Sentencing

The jury charge gave instructions for two criminal offenses: injury to a child causing serious bodily injury to a child fourteen years of age or younger, a first-degree felony, and aggravated assault with a deadly weapon, a second-degree felony. *See* TEX. PENAL CODE ANN. § 22.04(e); § 22.02.

8

For the injury to a child offense, the charge included three definitions of mens rea: intentionally, knowingly, and recklessly. The charge set forth that "[a] person acts intentionally, or with intent, with respect to the nature of [his] conduct when it is his conscious objective or desire to engage in the conduct." *See id.* § 6.03(a). It provided that, "[a] person acts knowingly, or with knowledge, with respect to the nature of his conduct when he is aware of the nature of his conduct." *See id.* § 6.03(b). Finally, it defined "recklessly" with the following definition:

> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care than an ordinary person would exercise under all the circumstances, as viewed from the actor's standpoint.

*See id.* at 6.03(c). The aggravated assault charge included only two states of mens rea: intentionally and knowingly. *See id.* § 6.03 (a)–(b).

The jury found Johnson guilty of intentionally or knowingly causing serious bodily injury to a child fourteen years of age or younger, and of intentionally causing aggravated assault with a deadly weapon. They sentenced her to two fifteen-year sentences in prison, which the trial court ordered to be served concurrently.

Johnson appealed.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

In reviewing the sufficiency of the evidence to support a conviction, we consider the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Stahmann v. State*, 602 S.W.3d 573, 577 (Tex. Crim. App. 2020) (citing *Jackson*

9

*v. Virginia*, 443 U.S. 307, 319 (1979)).

We consider both direct and circumstantial evidence as well as all reasonable inferences that may be drawn from the evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Nisbett v. State*, 552 S.W.3d 244, 262 (Tex. Crim. App. 2018); *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013). "Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Walker v. State*, 594 S.W.3d 330, 335 (Tex. Crim. App. 2020) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). We resolve any evidentiary inconsistencies in favor of the verdict, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Walker*, 594 S.W.3d at 336.

10

The elements for injury to a child are: (1) a person; (2) intentionally, knowingly, or recklessly; (3) by an act; and (4) causes serious bodily injury to a child. *See* TEX. PENAL CODE ANN. § 22.04(a). "Serious bodily injury" means a bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. *See id.* § 1.07(a)(46). For purposes of this offense, a child is defined as a person fourteen years of age or younger. *See id.* § 22.04(c)(1).

The elements for aggravated assault with a deadly weapon are met when: (1) a person; (2) intentionally or knowingly; (3) threatens imminent bodily injury to another; (4) and uses or exhibits a deadly weapon during the commission of the assault. *See id.* § 22.02(a). A "deadly weapon" means a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury. *See id.* § 1.07(a)(17)(A).

### III.    INTENT TO CAUSE INJURY TO A CHILD

Johnson argues that the "evidence is insufficient to show that [Johnson's] conscious objective in pointing the shotgun at her nephew's forehead was to shoot and seriously injury T.D." She argues that her conviction should be modified to reckless injury to a child in the second degree instead. *See* TEX. PENAL CODE ANN. § 22.04(a), (a)(1)(e). She asserts that she is a woman "in her late 50's with zero criminal history and her emotions ran too high when her 14[-]year[-]old [nephew] continued to bully and foul-mouth his younger sister" in her own home.

11

The State must prove that Johnson caused T.D.'s serious bodily injury with the requisite criminal intent. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Because injury to a child is a result-oriented crime, the accused acts with intent if it is her conscious objective or desire to cause the result. *See id*. (citing *Alvarado v. State*, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985)). Intent may be inferred from the acts and the words of the accused, as well as the surrounding circumstances. *See Hill v. State*, 883 S.W.2d 765, 769 (Tex. App.—Amarillo 1994, pet. ref'd). Transferred intent is recognized in Texas. *See Landrian v. State*, 263 S.W.3d 332, 335 (Tex. App.—Houston [1st. Dist.] 2007, *rev'd on other grounds*, 268 S.W.3d 532 (Tex. Crim. App. 2008). Transferred intent occurs when "there is evidence a defendant with the required culpable mental state intends to injure or harm a specific person but injures or harms a different person . . . ." *Id*. (quoting *Manrique v. State*, 994 S.W.2d 640, 647 (Tex. Crim. App. 1999)); *see* TEX. PENAL CODE ANN. § 6.04(b)(2) ("A person is nevertheless criminally responsible for causing a result if the only difference between what actually occurred and what he desired, contemplated, or risked is that a different person or property was injured, harmed, or otherwise affected.").

The evidence in the record shows that Johnson told Carver that T.D. and A.M. "were bad kids," that she did not like them, and that she did not associate with them because they had "problems." Cockroft testified that the firearm at issue, the shotgun, could not be operated without intentionally cocking the hammer back and pulling the trigger. A.M. recalled his fight with his aunt "escalating." He testified that he saw her grab the shotgun from behind the door, walk up to him, aim the shotgun at his forehead, and

12

cock it back. He also remembered seeing her finger on the shotgun's trigger, as the gun was only two feet away from his line of vision. Johnson did not deny that any of this occurred.

The evidence also showed that Johnson told Carver that she just wanted to "scare" A.M. after he rudely insulted both his sister and Johnson with foul language. Johnson explained that "she didn't know why it happened like that, and she didn't mean for it to happen like that." Further, Pamela reported that it seemed like her sister was in a "trance" and that she had to call Johnson's name three times before she responded. We also acknowledge that Johnson had no previous criminal history and was grieving the death of her husband, whom she lost two years prior to the incident. However, we are required to resolve any evidentiary inconsistencies in favor of the verdict, deferring to the jury as the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony. *Walker*, 594 S.W.3d at 335; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04.

Giving deference to the jury's resolution of the evidence, we hold that a rational trier of fact could have found that Johnson intentionally or knowingly acted to injure A.M. beyond a reasonable doubt. *See Stahmann*, 602 S.W.3d at 577; *Jackson*, 443 U.S. at 319. The jury could have found that Johnson acted knowingly or intentionally when she aimed the firearm at A.M., cocked the hammer, and put her finger on the trigger. Under the doctrine of transferred intent, she is still culpable for seriously injuring T.D. instead. *See Manrique*, 994 S.W.2d at 647. "The injury to a child statute requires that the accused intend bodily injury generally—it does not require the State to prove that the accused intended the specific injury that resulted or that the accused had knowledge that the exact

13

injury would result." *Kolb v. State*, 523 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). We overrule this issue.

## IV.   INTENT TO CAUSE AGGRAVATED ASSAULT WITH A DEADLY WEAPON

By her second issue, Johnson argues that the evidence is insufficient to establish that she intended to threaten A.M. with imminent bodily injury with her shotgun. She contends that she acted with recklessness, not intention, and that her conviction should be modified to the third-degree felony of deadly conduct instead. *See* TEX. PENAL CODE ANN. § 22.05(a). Deadly conduct occurs when a person "recklessly engages in conduct that places another in imminent danger of serious bodily injury." *Id.* To prove deadly conduct, the evidence must show that Johnson placed A.M. in imminent danger of serious bodily injury by pointing the shotgun at her nephew, regardless of whether she actually caused any bodily injury. *See Ramirez v. State*, 976 S.W.2d 219, 227 (Tex. App.—El Paso 1998, pet. ref'd) (holding that § 22.05 "covers intent which falls short of harming another; that is, although no physical harm results, the acts are highly dangerous").

Johnson, however, admitted that she wanted to "scare" her nephew A.M. to stop berating his sister by brandishing the firearm. A.M. testified that after his argument with his aunt escalated, Johnson reached for the shotgun, walked up to him, and pointed it at his forehead. He saw her cock the gun and put her finger on the trigger. T.D. testified that her brother was crying when this happened. As we are required to defer to the jury to weigh and draw reasonable inferences from the evidence, we hold that a rational trier of fact could have found that Johnson intentionally threatened to cause imminent bodily injury to A.M. by using or exhibiting a deadly weapon during the commission of the

14

assault.[4] *Stahmann*, 602 S.W.3d at 577; *Jackson*, 443 U.S. at 319. We overrule this issue.

## V.   CONCLUSION

We affirm the trial court's judgments.

LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
24th day of March, 2022.

---

[4] We further note that there is nothing in the record, such as a proposed jury instruction or an oral request during a charge conference, requesting the lesser-included offense of deadly conduct under § 22.05, either. *See* TEX. PENAL CODE ANN. § 22.05; TEX. R. APP. P. 33.1.