**Affirmed Opinion and Memorandum Opinion filed April 18, 2024.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00428-CR

---

### ANDRES ENRIQUE BONILLA, Appellant

### V.

### THE STATE OF TEXAS, Appellee

---

### On Appeal from the 337th District Court
### Harris County, Texas
### Trial Court Cause No. 1581793

---

### MEMORANDUM OPINION

In four issues appellant challenges his conviction for recklessly causing serious bodily injury to a child resulting in his 25-year prison sentence. He asks that we render an acquittal for insufficient evidence, alternatively, that we remand for a new trial based on the trial court's denial of his motion for mistrial during closing arguments, or alternatively reform the judgment to delete the trial court's deadly weapon finding and the reimbursement fees awarded in the judgment. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Andres Enrique Bonilla was charged in Harris County, Texas by indictment with Felony Murder in connection with the death of his girlfriend's (Molly's) two-year old daughter, Macie, on or about November 21, 2017.[1]

Latoya Johnson, Molly's mother, had been the primary caretaker of Macie and her older sister (Sis) when Molly was at work. In early November 2017, Johnson began a job which made her less available for these duties. Molly began dating appellant approximately two months before Macie's death. Molly testified that appellant would come over and stay the night "occasionally," "but not often." Molly had told the police that she was comfortable with appellant being with her children.

The jury heard evidence that Macie had suffered maladies and sustained injuries prior to the day of her death. Johnson testified that on Memorial Day in 2017, there was an incident where Macie was jumping on the bed, fell off and hit her head, prompting a call for the ambulance. Johnson testified that her lips turned blue. Molly testified that Macie started getting sick at the beginning of November and that Macie was "whiney, not eating, barely sleeping, and [she had] a fever." On November 9, 2017, appellant dropped Molly and Macie off at the hospital, where Macie was discovered to have a fever and was diagnosed with an upper respiratory infection. Macie was prescribed antibiotics but became sick again. She was congested, having a "hard time breathing," not eating, losing weight, and her hair was falling out. On the night of November 20, the family members reported Macie to have "cried the whole night," was not eating, and was losing hair. Macie reportedly "whined all night kind of like a little baby. She whined because she

---

[1] To protect the identities of minors of the family involved we have provided pseudonyms for many of those mentioned.

didn't feel good."

Evidence of the events that occurred on the night Macie was injured came through Molly's testimony and appellant's recorded statements to the police (through the testimony of Sergeant Simmons). Around 3:00 or 4:00 in the afternoon of November 21, 2017, appellant visited Molly and her girls at Molly's apartment and agreed to babysit the children that night while Molly worked. Appellant left the apartment but returned just before 10:00 p.m.—when Molly was due to start her shift. Late for work, Molly rushed out of the apartment to meet appellant's brother who gave Molly a ride to her job at McDonald's. Although Sis was asleep in the apartment when Molly left, Macie was awake and active. Within minutes of Molly's departure, Macie got up and was trying to wake up Sis. Appellant reported to Molly that he had told Macie to stop "messing with her sister," and then some violent incident occurred which inflicted serious trauma to Macie's brain causing her to go limp, lose consciousness, have a seizure, and begin to vomit or foam at the mouth. Appellant called Molly and told her that he freaked out and threw Macie against the wall and to "just get here, just get here[,]" prompting Molly to leave work immediately and run the 1.2 miles between McDonald's and her apartment.

When Molly arrived about 15 minutes later, appellant ran out to meet her and told her to stay strong and be calm before she entered the apartment. Molly went into the apartment and saw Macie lying on the living room floor, wrapped in a towel, unconscious, and struggling to breathe. Molly told appellant to call 9-1-1, but he replied, "no, we can just catch the bus." Because the battery on her own cellphone was depleted and appellant would not agree to call the 9-1-1, Molly ran to a neighbor's apartment and borrowed a phone to call 9-1-1 at 10:42 p.m. An ambulance arrived and transported Macie to a hospital, but Molly was required to

remain behind at the apartment until the police arrived. At 12:48 a.m. on November 22, 2017, medical personnel pronounced Macie deceased.

On May 26, 2022, appellant's case proceeded to a jury trial. During closing arguments the prosecutor argued, "He's not going to tell you exactly what happened that night[,]" prompting appellant's objection which the court sustained. At appellant's request the trial court instructed the jury to disregard the comment but denied his motion for mistrial.

The jury's instructions included the charged offense of Felony Murder and lesser included offenses for causing serious bodily injury to a child. The jury found appellant guilty of the lesser-included, second-degree felony offense of recklessly causing serious bodily injury to a child.

The jury found the State's punishment-enhancement allegation "true" and assessed appellant's punishment at confinement in the Texas Department of Criminal Justice, Correctional Institutions Division, for 25 years. The trial court sentenced appellant in accordance with the jury's verdict, and entered a deadly weapon finding in the court's judgment of conviction and sentence. In addition to his conviction and sentence, the trial court's judgment includes an order that appellant pay $1,800 in "reimbursement fees."

## II. SUFFICIENCY OF THE EVIDENCE

In his first issue appellant challenges the legal sufficiency of the evidence to support his conviction for recklessly causing serious bodily injury to Macie by striking her with or against a deadly weapon, namely, a blunt object. In his brief, appellant argues "there was no evidence as to which of [Macie's] numerous injuries resulted from appellant's allegedly reckless action, there was no evidence that any injury or injuries resulting from appellant's alleged action constituted

4

serious bodily injury as required by Tex. Pen. Code § 6.04(a), or that any serious bodily injury was caused by appellant's use of a deadly weapon."

## A. Standard of Review

In evaluating his legal insufficiency complaint, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The issue on appeal is not whether we, as a court, believe the State's evidence or believe that appellant's evidence outweighs the State's evidence. *Wicker v. State*, 667 S.W.2d 137, 143 (Tex. Crim. App. 1984). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt. *Matson v. State*, 819 S.W.2d 839, 846 (Tex. Crim. App. 1991). The jury "is the sole judge of the credibility of the witnesses and of the strength of the evidence." *Fuentes v. State,* 991 S.W.2d 267, 271 (Tex. Crim. App. 1999). The jury may choose to believe or disbelieve any portion of the witnesses' testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). When faced with conflicting evidence, we presume the jury resolved conflicts in favor of the prevailing party. *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993). Therefore, if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, we must affirm. *McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997).

## B. Analysis

The indictment alleges that appellant

> intentionally, knowingly, and recklessly and with criminal negligence causing Serious Bodily Injury to [Macie], the Complainant, a child younger than 15 years of age, by striking the complainant with or against a deadly weapon, namely a blunt object, and while in the course of and furtherance of the commission of said offense did commit and attempt to commit an act clearly dangerous to human life, to-wit: striking complainant with or against a deadly weapon, namely

5

a blunt object and did thereby cause the death of [Macie].

The indictment and the jury charge both track the language of Penal Code section 22.04(a) which provides that a person commits an offense if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child ... (1) serious bodily injury; (2) serious mental deficiency, impairment, or injury; or (3) bodily injury." Tex. Penal Code § 22.04(a). The Penal Code defines "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code § 1.07(a)(46).

The jury's verdict reflects the jury's finding that appellant's conduct—as described in the charge—consisted of "*recklessly* caus[ing] serious bodily injury to [Macie], . . .a child younger than fifteen years of age, by striking [Macie] with or against a deadly weapon, namely, a blunt object. . .."

While the statue requires some level of intent to cause serious bodily injury, the state was not required to prove that appellant intended the specific injury that resulted or that appellant knew which exact injury would result. *See Kolb v. State*, 523 S.W.3d 211, 216 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd). When the conduct is engaged in *recklessly*, the offense is a felony of the second degree. Tex. Penal Code § 22.04(e). A person acts *recklessly*, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct, when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. Tex. Pen. Code § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. Tex. Pen. Code § 6.03(c). A

person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient. Tex. Pen. Code Ann. § 6.04. A "deadly weapon" includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Pen. Code § 1.07(a)(17)(B).

*Serious Bodily Injury*

Appellant challenges the legal insufficiency based on testimony of illnesses and injuries Macie reportedly had sustained before she came into his care on the night of her death. He contends he did not cause those injuries "since the injury caused by [appellant's] alleged action was never identified," and that if she sustained any injuries with him they were not serious bodily injuries that brought about her death. In support of his contention, he points to the facts that when she was brought to the hospital there were no significant outward signs of trauma, that an injury to her left frontal scalp was noted to contain "iron which would mean that the injury is 72 hours old or could be weeks old or months old," and that Macie had significant ongoing upper respiratory problems which one doctor testified would aggravate a brain hemorrhage. He accurately notes that the record provides that: "No fresh or dried blood was found on [Macie's] forehead or skull. No bruises or bumps were observed. No external injuries were observed. The hospital record diagnosis was acute respiratory failure." Appellant's expert witness was Dr. Shaffer, a pediatrician, who testified that the 40 CC liquid subdural hemorrhage had early organization which means that it had probably been there for a "few days, at least," and criticized the State's witnesses for neglecting to consider evidence of the child's cardiorespiratory status.

Dr. Kathy Pinneri, a forensic pathologist and Director of Montgomery

7

Forensic Services, testified that when she autopsied Macie's body on November 22, 2017, she observed numerous external injuries to Macie's face and head, including: five contusions or bruises on the left side of Macie's face; two contusions on the right side of Macie's forehead above Macie's eyebrow and in the area of her right temple; bruising on the backside of Macie's left ear; and a red, linear contusion and another bruise on the right side of the back of Macie's head. Dr. Pinneri then explained that, when she opened Macie's skull to conduct an internal examination, she observed extensive hemorrhaging (bleeding) and hematoma (collected blood) in Macie's brain.

Dr. Pinneri testified that the hemorrhage was on both sides of Macie's brain, but was "a lot more over the right side and even underneath the right side lining the base of the skull, which is what the subdural hematoma is." Dr. Pinneri elaborated that "on the left side, it was mainly towards the back of the brain[,]" whereas "on the right side, there was a film of hemorrhage over the entire right side and then there was some hemorrhages on the inferior or underneath the right side of the brain." Dr. Pinneri then quantified the hemorrhage, stating that she collected 40cc of liquid blood, and explained that, for a child Macie's age, "that's a significant amount of blood" that would "cause a significant problem[,]" given that there is very little space between the brain and the dura of a young child. Dr. Pinneri further opined that, in her expert opinion, although Macie had some injuries that showed signs of healing and could have been more than 72 hours old, many of Macie's subdural brain injuries—including the worst of them—"were not more than a day old, not even close."

Dr. Pinneri explained that Macie's severe fatal brain injuries were produced by blunt-force trauma to Macie's head, and that she believed the injuries were non-accidental and that they were caused by another person, rather than being self-

8

inflicted, such as by Macie falling down or running into a wall.

Dr. Pinneri concluded that, given the severity of the trauma to Macie's brain, she expected that Macie would have exhibited symptoms quickly, including becoming immobile, having a seizure, struggling to breathe, and vomiting or foaming at the mouth—all symptoms that appellant reported he observed, prompting him to call Molly at work and tell her to come home immediately.

Dr. Rudolph Castellani, a neuropathologist with whom Dr. Pinneri consulted prior to making her final determination that the cause of Macie's death was homicide by blunt-force trauma to the head, testified that he examined Macie's brain, dura mater, spinal cord, and eyes after Dr. Pinneri sent them to him for analysis. Dr. Castellani reported seven diagnoses that he made upon examining the specimens, all of which "[were] compatible with blunt force trauma or traumatic injury" to Macie's brain and were "lethal trauma."

Dr. Castellani explained that a subdural hemorrhage is a "significant finding" and that such injuries are usually due to blunt-force trauma, which causes the brain to move inside the skull and ruptures the veins that bridge the brain— producing "hemorrhage into a particular compartment called the subdural compartment…."

Dr. Castellani explained that the multi-layered nature of these hemorrhages evinced their severity because "it's not just an isolated hemorrhage" and stated that he observed these multi-layered hemorrhages in both of Macie's eyes. Dr. Castellani testified that "there's a multitude of potential causes for retinol [sic] hemorrhages[,]" but explained that "when they are extensive in particularly, when they extent [sic] interiorly, that's been studied fairly closely in literature and that has a strong association with blunt force trauma to the head and specifically blunt force trauma to the head that was not of that person's doing. It was not accidental."

9

Dr. Castellani observed some hemorrhaging around Macie's spinal cord structures, outside of her dura mater. Dr. Castellani explained that, in pediatric head-trauma cases like Macie's, this type of finding is associated with inflicted traumatic injury, rather than a non-traumatic scenario. Similarly, Dr. Castellani recounted that he documented Macie's brain to exhibit "traumatic axonal injury, splenium of corpus callosum, subcortical white matter, deep cerebral hemisphere and brainstem." Dr. Castellani explained that axonal damage of this nature affects "the substance of the brain" and is "usually due to movement of the brain that's inside the skull or shearing of the brain or movement of one tissue plane over another." Dr. Castellani further stated that "usually it takes some degree of rotation of the head to produce that type of injury." He testified about the probable effects of the injuries he observed:

> [Prosecutor:] Okay. What are typical responses that you would expect of somebody who's experienced a level of trauma that you observed in [Macie]?
>
> [Dr. Castellani:] Well, this is lethal trauma. Individuals who suffer lethal blunt force trauma to the head are usually either immediately unresponsive or immediately dead or in very bad shape.

Based on the doctors' testimony concerning the nature of Macie's severe blunt-force-trauma-induced brain injuries, and particularly their characterization of the injuries as lethal, the jury could rationally conclude beyond a reasonable doubt that Macie suffered serious bodily injury. Tex. Penal Code § 1.07(a)(46); *see also Green v. State*, No. 14-96-01536-CR, 1999 WL 33620, at *10 (Tex. App.—Houston [14th Dist.] Jan. 28, 1999, pet. ref'd) (not designated for publication) (finding sufficient evidence that the defendant caused serious bodily injury when the defendant's conduct resulted in a subdural hemorrhage that resulted in the victim's death); *Flores v. State*, No. 07-20-00209-CR, 2021 WL 4306216, at *1 (Tex. App.—Amarillo Sept. 22, 2021, no pet.) (mem. op., not designated for

10

publication) (holding a jury could rationally conclude beyond a reasonable doubt that the defendant caused serious bodily injury when a physician testified as to the seriousness of a brain hemorrhage that resulted from the defendant's conduct).

### *Recklessly Caused*

Appellant argues that Macie sustained 42 injuries *before* appellant watched over Macie the night she died, and contends the evidence was legally insufficient to establish that he caused *any* injury to bring about her death. Thus, he contends that there was no evidence regarding which of Macie's numerous injuries resulted from appellant's allegedly reckless behavior during the short time with him.

Doctors Pinneri and Castellani provided significant testimony that Macie suffered recent lethal trauma to her head. They also both testified that Macie's injuries were unlikely to have been self-inflicted or accidental. Additionally, Molly reported that when she left the house for work, Macie was conscious, breathing, walking, talking, and interactive. Appellant provided a consistent account in his statement to the police that Macie was awake and actively trying to wake-up Sis right after Molly left for work, and that he told Macie to stop "messing" with her sister. Thus, the jury was supplied ample facts to reach the conclusion that, despite Macie's ongoing maladies, she was, at the time Molly left Macie alone with appellant, not exhibiting signs of fatal trauma.

Molly testified that Appellant told her over the phone that he "kind of freaked out" and "threw [Macie] to the wall" shortly after Molly left the apartment for work. These circumstances not only lend to the reasonable conclusion that appellant was the only adult and only awake person with Macie when her severe blunt-force-trauma-induced brain injuries occurred, but that he was aware of but consciously disregarded a substantial and unjustifiable risk of causing Macie serious bodily injury by throwing her to the wall. *See* Tex. Pen. Code § 6.03(c).

11

Upon this record, the jury could reasonably conclude that appellant's reckless conduct was the cause of Macie's serious bodily injuries. *See Martinez v. State*, 468 S.W.3d 711, 715-17 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (finding sufficient circumstantial evidence to support the defendant's conviction for injury to a child when, among other evidence, the defendant was the victim's primary caretaker at the time the injuries occurred and medical evidence established that the victim's injuries were the product of non-accidental trauma); *see also Mayreis v. State*, 462 S.W.3d 569, 574 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (finding evidence sufficient to establish that the defendant caused the victim's injuries when he was the only person with her when the injuries occurred).

### *Deadly Weapon*

Although Molly testified that appellant told her he threw Macie to the wall, the appellant complains that insufficient evidence supports the jury's implicit finding that appellant used a blunt object as a deadly weapon during the offense. The Penal Code defines a "deadly weapon" as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code § 1.07(a)(17)(B). A *serious* bodily injury is one that "creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." Id. § 1.07(a)(46). The deadly weapon statute is "exceedingly broad," and there is no limitation as to what type of item may be considered a deadly weapon. *Prichard v. State*, 533 S.W.3d 315, 320 (Tex. Crim. App. 2017); *see e.g.*, *Gordon v. State*, 173 S.W.3d 870, 873-75 (Tex. App.—Fort Worth 2005, no pet.) (finding sufficient evidence to support finding that a blunt object was used as a deadly weapon when medical testimony established that the child-victim suffered a blunt-force head injury that was consistent with being struck by or against a blunt object, and that

the blunt object could have been "a wall, floor, concrete patio, or something 'heavy and flat.'"). A deadly weapon finding may be made even in the absence of actual harm or threat. *Prichard*, 533 S.W.3d at 320. That is, an object is a deadly weapon if the actor intends to use the object in such a manner that renders it merely capable of causing death or serious bodily injury. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000) ("The placement of the word 'capable' in the provision enables the [deadly weapon] statute to cover conduct that threatens deadly force, even if the actor has no intention of actually using deadly force.").

Although as appellant points out there was no evidence discovered on the walls of the apartment to support Macie's testimony, the absence of that evidence did not negate that theory and Macie's injuries were consistent with trauma with the wall or other similar blunt object.

A factfinder may affirmatively find that a deadly weapon was used even if the particular object allegedly used as a deadly weapon is not identified. *Regan v. State*, 7 S.W.3d 813, 819-20 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd); *Mixon v. State*, 781 S.W.2d 345, 346-47 (Tex. App.—Houston [14th Dist.] 1989), *aff'd*, 804 S.W.2d 107, 108 (Tex. Crim. App. 1991). The presence and severity of the injuries, if any, inflicted on the victim are factors to be considered in determining whether an object was used as a deadly weapon. *Lane v. State*, 151 S.W.3d 188, 191 (Tex. Crim. App. 2004); *Bethel v. State*, 842 S.W.2d 804, 807 (Tex. App.—Houston [1st Dist.] 1992, no pet.); *Mixon*, 781 S.W.2d at 347.

Doctors Pinneri and Castellani testified that Macie sustained serious bodily injury in the form of severe—and ultimately lethal—brain injuries. Further, Doctors Pinneri and Castellani explained that Macie's serious bodily injuries were caused by "substantial," non-self-inflicted, blunt force trauma to Macie's head, and could have consisted of multiple blows. The doctors and Sergeant Simmons also

testified that many objects or things are capable of inflicting blunt-force trauma and causing serious bodily injury, including a bathtub, a toilet, an adult's hand or hands, a doorframe, or a wall. The severity and nature of the injuries inflicted upon Macie demonstrate that the wall or other blunt object that appellant struck Macie with or against constituted a deadly weapon. *See Lane v. State*, 151 S.W.3d at 191; *Bethel v. State*, 842 S.W.2d at 807; *see also Mixon*, 781 S.W.2d at 347. Importantly, Molly testified that appellant told her over the phone that when he "freaked out" he "threw [Macie] to the wall". Under the applicable standard of review, we conclude the record contains sufficient evidence to sustain the deadly-weapon finding; specifically that appellant used a blunt object, the wall, as a deadly weapon during the offense. *See Mixon v. State*, 781 S.W.2d at 346-47; *see also Gordon v. State*, 173 S.W.3d at 873-75; *see also Johnson v. State*, 150 S.W.3d 630, 639-40 (Tex. App.—Austin 2004, no pet.) (affirming a deadly weapon finding when evidence established that the defendant beat the child with a belt, hit him with his hands, and threw him against hard surfaces, and medical testimony established that such abuse was capable of causing death or serious bodily injury).

## C. Conclusion of Sufficiency of the Evidence

Under the applicable standard of review, a rational trier of fact could have found beyond a reasonable doubt that appellant recklessly caused serious bodily injury to Macie by striking her with or against a deadly weapon, namely, a blunt object. *See Martinez v. State*, 468 S.W.3d at 715-17; *see also Mixon*, 781 S.W.2d at 347. Finding no merit in appellant's challenge to the legal sufficiency of the evidence supporting his conviction for *recklessly* causing serious bodily injury or the legal sufficiency of the evidence supporting deadly weapon finding, we overrule his first and second issues.

## III. MOTION FOR MISTRIAL

14

In his third issue, appellant claims that the trial court abused its discretion in denying appellant's motion for mistrial during closing argument after the prosecutor improperly commented on appellant's failure to testify, in violation of the Fifth Amendment of the United States Constitution; Article 1, Section 10, of the Texas Constitution; and Article 38.08 of the Texas Code of Criminal Procedure

The complained-of statement by the prosecutor occurred during the State's closing argument as follows:

> [Prosecutor:] Defense's argument. A number that they make, this is one that I thought would be kind of highlighted more in their closing argument but it really wasn't. But even Doctor Shaffer wasn't able to say that her infection caused all of these injuries. Those are caused by blunt force trauma to the head, not by an illness. Was she sick? Absolutely. Was she more susceptible to getting sick because she lived in a very stressful, chronic, stress environment? Yeah, I think so. And this wasn't even talked about in their closing argument but it was kind of put out there yesterday and the day before that [Macie] might have had a rebleed from a prior injury. Well, we know that she wasn't taken to the hospital when she jumped off the bed and knocked the wind out and [sic] her back in the summer of 2017 when she was at [Johnson's] house. She was fine. She would have been exhibiting symptoms after that similar to the ones she experienced on the 21st of November. And a new less severe injury doesn't explain the retinal hemorrhages, the spinal cord hemorrhages, the axonal injuries, and the new contusions all over the different planes of her head. ***He's not going to tell us what exactly happened that night.***
>
> [Appellant's Trial Counsel]: I object to that argument.
>
> [Trial Court]: Sustained.
>
> [Appellant's Trial Counsel]: I am going to ask the jury to disregard that argument.
>
> [Trial Court]: The jury is instructed to disregard.
>
> [Appellant's Trial Counsel]: I ask for a mistrial.
>
> [Trial Court]: That's denied.
>
> On appeal we review only the court's adverse ruling; we consider whether

15

the court erred in failing to grant a mistrial. *See Hawkins v. State*, 135 S.W.3d 72, 76–77 (Tex. Crim. App. 2004)(when the objection preceding the motion for mistrial is sustained "[t]he only adverse ruling—and thus the only occasion for making a mistake—was the trial court's denial of the motion for mistrial").

Thus, the issue before us is whether the trial court abused its discretion by denying appellant's request for a mistrial. *See Archie v. State*, 340 S.W.3d 734, 738–39 (Tex. Crim. App. 2011); *Hawkins*, 135 S.W.3d at 77. Mistrial is a remedy appropriate for a narrow class of highly prejudicial and incurable errors. *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000). An appellate court views the evidence in the light most favorable to the trial court's ruling, considering only those arguments before the court at the time of the ruling. *Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). The ruling must be upheld if it was within the zone of reasonable disagreement. *Id.*; *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). Because it is an extreme remedy, a mistrial should be granted "only when residual prejudice remains" after less drastic alternatives are explored. *Ocon v. State*, 284 S.W.3d at 884-85 citing *Barnett v. State,* 161 S.W.3d 128, 134 (Tex. Crim. App. 2005).

To determine whether the trial court abused its discretion in denying appellant's motion for mistrial, we balance the following factors: (1) the severity of the misconduct—i.e., the magnitude of the prejudicial effect of the prosecutor's remarks; (2) the measures adopted to cure the misconduct—i.e., the efficacy of any instructions by the judge; and (3) the certainty of conviction absent the misconduct—i.e., the strength of the evidence supporting the conviction. *Archie*, 340 S.W.3d at 739; *Hawkins*, 135 S.W.3d at 77. "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Hawkins*, 135 S.W.3d at 77.

We first look to severity of the prosecutor's misconduct; the magnitude of the prejudicial effect his statement—"He's not going to tell us what exactly happened that night." *Archie v. State*, 340 S.W.3d at 741 ("the question is not *whether* the prosecutor's improper questions during his final argument had these consequences, but rather, the extent to which they did—the "severity" or "magnitude" of the prejudice they likely caused."). We conclude severity of prejudice caused by the prosecutor's comment in this case is modest. The State applies the proper standard,[2] and we agree with the State that the timing of the prosecutor's statement that immediately followed the trial court's order denying the motion for mistrial, was "regrettable," but did not elevate the magnitude of prejudice likely caused to reach an overwhelming measure. *See Lopez v. State*, No. 14-15-00887-CR, 2017 WL 1181294, at *5 (Tex. App.—Houston [14th Dist.] Mar. 30, 2017, pet. ref'd) (mem. op., not designated for publication) (noting that the prosecutor repeated references to the co-defendants' assertion of Fifth Amendment right not to testify two more times after the original offending comment, and explaining "[t]o be sure, the severity of the misconduct factor likely increases when, as here, a party continues to refer to matters regarding which the court has already sustained objections. However, we disagree that the prosecutor's statement reached the high level of prejudice appellant argues."). The comment—"Nobody knows exactly what blunt object [Macie] was struck against or were [sic] used to strike her that night except for this man right here"—did not independently amount

---

[2] In failing to frame his argument around the appropriate standard in this case, appellant does not squarely address any of the relevant factors. We nevertheless liberally construe his brief to rest upon the position that the severity of the prejudice was significant, e.g., under another standard he argues "[b]ecause the record reflects that the error's impact manifestly harmed the jury's decision-making, it cannot be found beyond a reasonable doubt that the error did not contribute to appellant's conviction."

17

to a Fifth Amendment violation. Upon concluding his rebuttal point with this comment the prosecutor moved on without further repetition.

Neither side has acknowledged that, apart from the fact appellant exercised his right not to provide live testimony in his defense, the jury heard his account as provided in multiple recorded statements to investigators. Prior to the prosecutor's challenged-comment, a significant part of the prosecutor's closing argument consisted of summarizing relevant parts of appellant's recorded statements and drawing attention to appellant's comments that were inconsistent with his defense. Under these circumstances, the Court of Criminal Appeals has repeatedly refused to accord similar prosecutorial comments the weight required to achieve a reversal for violation of the Fifth Amendment right not to testify. *Cruz v. State*, 225 S.W.3d 546, 549 (Tex. Crim. App. 2007) ("[T]he case at hand is more analogous to *Wolfe v. State*, in which we held that a prosecutor's reference in jury argument to information not provided by a defendant at trial was not a comment on the defendant's failure to testify when the defendant's own exculpatory statement was admitted into evidence") *citing Wolfe v. State*, 917 S.W.2d 270, 280 (Tex. Crim. App. 1996).

Moreover, the record of the arguments makes clear the prosecutor's statement was couched as part of his response to appellant's counsel's arguments that the State lacked evidence on the elements of causation and deadly weapon. Appellant's trial counsel had argued:

> Those five minutes that he's alone with [Macie], that's when they say this happened. Doctor Pinneri testified that this injury that [Macie] suffered could have happened as much as a day before. That's their expert witness. They don't know when this injury happened, that is reasonable doubt.
>
> The prosecution tries to downplay the blunt object. Ladies and gentlemen, this is a murder case. Where is the murder weapon that

18

supposedly was used on [Macie]? The prosecution says, it could be the kitchen sink, it could be the toilet, it could be a floor, it could be this, it could be that. . .

. . .And there's no damage in any wall in that house. The CSU officer didn't note any damage on that wall. They can't just say, oh, it's a blunt object, we'll let you decide what it is. That's not the way it works. It's their burden of proof. It's part of their case. It's an element of the offense that they have to prove beyond a reasonable doubt and they can't tell you. They want you to guess what it is.

…

I'm talking about what I said in opening, folks. I said that the State's doctor don't [sic] know if anyone injured the child. They don't know who injured the child. They don't know how the child was injured and they don't know when the child was injured. Well, all of those things turned out to be true.

In response, the prosecutor addressed the evidence provided by the State's doctors, discussed how the evidence of the incident and recent serious injuries were not even discovered on the surface of the child's body, but rather under her skin at multiple places. Thus any harm caused by the prosecutor's the comment was diminished since it was made in the context of other valid arguments in response. *See Longoria v. State*, 154 S.W.3d 747, 764 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("Because the prosecutor's statement was essentially a response to defense arguments, we do not consider it as particularly offensive or flagrant.")

*Remedial Measures*

With respect to the second factor, the record shows that the trial court immediately instructed the jury to disregard the argument. Except in the most blatant cases, harm from a prosecutor's comment on the defendant's failure to testify is cured by the trial court's instruction to disregard. *See Moore v. State*, 999 S.W.2d 385, 405-06 (Tex. Crim. App. 1999) (acknowledging that the

19

"presumption that an instruction [to disregard] generally will not cure comment on failure of the accused to testify…has been eroded to the point that it applies only to the most blatant examples[,]" and that "[o]therwise, this Court has tended to find the instruction to have force.") (quoting *Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995)); *Newby v. State*, 252 S.W.3d 431, 438 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) ("Almost any improper argument may be cured by an instruction to disregard.").

The record further shows that the trial court delivered clear instructions to the jurors in its jury charge that appellant had a constitutional right to remain silent and refuse to testify, and that the jury could not consider such silence as evidence of appellant's guilt:

> Our law provides that a defendant may testify in his own behalf. This, however, is a right accorded a defendant, and in the event he elects not to testify, that fact cannot be taken as a circumstance against him.
>
> In this case, the defendant has elected not to testify and you are instructed that you cannot and must not refer to or allude to that fact throughout your deliberations or take it into consideration for any purpose whatsoever as a circumstance against him.

These written instructions operated as an additional measure to cure any impropriety. *Miles v. State*, 204 S.W.3d 822, 827-28 (Tex. Crim. App. 2006) (illustrating that the trial court's written jury charge, which contains instructions concerning the defendant's rights, can operate as a curative measure following an improper comment by a prosecutor); *see also Bigbie v. State*, No. 14-19-00504-CR, 2021 WL 2586346, at *7-8 (Tex. App.—Houston [14th Dist.] June 24, 2021, pet. ref'd) (mem. op., not designated for publication) ("We conclude that the trial court's charge correctly setting forth the presumption of innocence, combined with its prompt instruction to disregard the State's comments, weigh in favor of concluding the trial court did not abuse its discretion by denying appellant's

20

motion for a mistrial.")

*Certainty of the Inculpative Proof*

The certainty of the evidence was significant enough to establish that, outside of his conduct at any other time, appellant acted recklessly on the night of Macie's death, both generally and specifically with respect to her death. Appellant was the only adult and only person with Macie when first, he observed that she was awake, alert and trying to wake her sister, and then moments later found her unconscious—exhibiting all the signs of having suffered severe trauma. This evidence, together with Molly's testimony that appellant told her he freaked out and threw Macie to the wall, refused Molly's request to call the police and suggested taking the bus, all lead to the reasonable conclusion regarding appellant's guilt; that he was aware of but consciously disregarded a substantial and unjustifiable risk of causing Macie serious bodily injury in throwing her to the wall. *See Martinez v. State*, 468 S.W.3d 711, 715-17 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (finding sufficient circumstantial evidence to support the defendant's conviction for injury to a child when, among other evidence, the defendant was the victim's primary caretaker at the time the injuries occurred and medical evidence established that the victim's injuries were the product of non-accidental trauma); *see also Mayreis v. State*, 462 S.W.3d 569, 574 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (finding evidence sufficient to establish that the defendant caused the victim's injuries when he was the only person with her when the injuries occurred).

Upon this record, balancing the three considerations, we cannot conclude the trial court abused its discretion when it denied appellant's motion for a mistrial. The prosecutor's improper comment, presented in conjunction with unobjectionable rebuttal arguments, was not so egregious or prejudicial that the

21

trial court's immediate instruction to disregard, buttressed by the written charge instructions, was not sufficient to cure the error. *See Archie*, 340 S.W.3d at 740-42 (finding no abuse of discretion in the trial court's denial of a mistrial following the prosecutor's comments on the defendant's failure to testify when the magnitude of the prejudice from the prosecutor's remarks "was not so great that a jury would necessarily have discounted the trial court's firm instructions to disregard them."); *see also Lopez v. State*, No. 2017 WL 1181294, at *6 (concluding that the balance of the *Mosley* factors established that a mistrial was not warranted, even when the prosecutor repeated the challenged statement, because "the magnitude of the harm [was] outweighed by the second and third factors."

Accordingly, we overrule appellant's third issue.

## IV. REIMBURSEMENT FEES

In his fourth issue, appellant contends the evidence was insufficient to support the portion of the judgment requiring his payment of $1,800.00 in reimbursement fees.

Under his fourth issue, appellant also argues the reimbursement fees were improper in the absence of evidence of appellant's financial resources or ability to pay. Appellant references Texas Code of Criminal Procedure article 26.05(g), as the starting point of his argument; this provision pertains to "reimbursement fees" ordered to offset the cost of legal services provided to defendant deemed eligible as indigent. The provision allows the trial court to order a defendant to repay costs of court-appointed legal counsel as a "reimbursement fee" if the court finds that the defendant presently has adequate financial resources to pay. *Id*. Appellant argues that the "record in this case does not contain any such determination or finding by the trial court that appellant had any financial resources or was able to pay the reimbursement fees," and that therefore, in the absence of such finding the court

22

erred in ordering reimbursement. In further support of this argument appellant cites *Mayer v. State*, for various propositions in connection with the reimbursement of attorney's fees under article 26.05. 309 S.W.3d 552, 557 (Tex. Crim. App. 2010). However, there is nothing in the record to support appellant's assumption on appeal that the "reimbursement fee" related to court-appointed counsel as appellant had not been deemed indigent or appointed an attorney by the court .[3]

As the State points out, the record, including the Criminal Bill of Costs, indicate that the "reimbursement fees" included in the judgment relate to various law enforcement agency ("LEA") fees. Article 102.011 provides for "reimbursement fees to defray the cost of the services provided in the case by a peace officer"-- to execute a capias, to summon witnesses, for costs associated with traveling to summon or attach witnesses, to approve a bond, for commitment or release of the defendant, and to summon a jury. *See* Tex. Code Crim Proc. art. 102.011(a) ("Reimbursement Fees for Services of Peace Officers"). In his Reply Brief, appellant dismisses the State's point largely on the basis that the numbers do not add up to reach that conclusion. We disagree, as the challenged reimbursement fee is the sum total of the LEA fees noted on the bill of costs.

---

[3] Post-judgment, on June 13, 2022, the trial court subsequently found appellant indigent for purposes of "employing counsel or paying for a clerk's and court reporter's record." Though he has not raised any constitutional challenge, we note this court has previously held that fees under Article 102.011 present no constitutional violation of an indigent defendant's right to compulsory process. *See Merrit v. State*, 529 S.W.3d 549, 557–59 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd); *Johnson v. State*, 550 S.W.3d 247, 258 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd).

| Fee Description | Amount Assessed |
|---|---|
| LEA - Attach/Convey Witness | $1,670.00 |
| Consolidated Court Cost -State | $185.00 |
| Consolidated Court Cost -Local | $105.00 |
| LEA - Capias Execution | $50.00 |
| LEA - Bond Approval Fee | $20.00 |
| LEA - Commitment Fee | $20.00 |
| LEA - Release Fee | $20.00 |
| LEA - Arrest w/out Capias | $15.00 |
| LEA - Summon Jury | $5.00 |
| Assessed Date: 6/8/2022 | Total Amount Assessed: $2,090.00 |
| | Total Paid: $0.00 |
| | Total Due: $2,090.00 |

In arguing only that the record lacks proof of reimbursement fees for appointed counsel (a moot, uncontested point), appellant has not averred that the record lacks any support for reimbursement costs for legal enforcement agencies fees. Appellant's brief provides no indication that he has audited the two-volume clerks record (covering a four-year docketing period and spanning over 1000 pages) to determine the propriety of the legal enforcement agencies' fees nor does he make any request that this court embark in that tedious endeavor. He therefore has waived a sufficiency challenge to legal enforcement agencies' fees. Tex. R. App. P. 38.1(i); see also *Pruitt v. State*, 646 S.W.3d 879, 888 (Tex. App.—Amarillo 2022, no pet.)("Appellant provides neither authority nor direction through the record for leading us to the conclusion he desires. Rather, he and the State would leave us to audit the bills of costs by rummaging unguided through the clerk's records."); *see also Mack v. State*, No. 01-20-00068-CR, 2020 WL 6731654, at *1 (Tex. App.—Houston [1st Dist.] Nov. 17, 2020, no pet.)(not

24

designated for publication).[4]

We therefore overrule appellant's fourth issue.

## V. CONCLUSION

Having overruled appellant's four issues, we affirm the judgment of the trial court.

/s/     Randy Wilson
            Justice

Panel consists of Justice Hassan, Justice Poissant and Justice Wilson.

Do not publish — Tex. R. App. P. 47.2(b)

---

[4] We note however, in addition to the Bill of Costs the clerks record contains evidence of various services, multiple issued subpoenas and executed returns, reimbursable under article 102.011.